Brian S. Kabateck, SBN 152054
bsk@kbklawyers.com
Christopher B. Noyes, SBN 270094
cn@kbklawyers.com
Katherine A. Bruce, SBN 288694
kb@kbklawyers.com
Stephanie E. Charlin, SBN 316543
sc@kbklawyers.com
**KABATECK LLP**
633 W. Fifth Street, Ste. 3200
Los Angeles, CA 90071
T 213.217.5000 | F 213.217.5010

*Attorneys for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TASHA STACK, individually, on behalf of herself and on behalf of all others similarly situated;<br><br>Plaintiffs,<br><br>vs.<br><br>PROGRESSIVE SELECT INSURANCE COMPANY, PROGRESSIVE CASUALTY INSURANCE COMPANY and DOES 1 through 50, inclusive;<br><br>Defendants. | **CLASS ACTION COMPLAINT FOR:**<br><br>(1) **VIOLATION OF BUSINESS AND PROFESSIONS CODE §§ 17200, ET SEQ.;**<br>(2) **FRAUD;**<br>(3) **NEGLIGENT MISPRESENTATION;**<br>(4) **BREACH OF CONTRACT**<br>(5) **BREACH OF IMPLIED COVENANT OF OOD FAITH AND FAIR DEALING; AND,**<br>(6) **VIOLATION OF CONSUMER LEGAL REMEDIES ACT (Civ. Code §§ 1770 (a)(2), (a)(3), (a)(5), (a)(7), (a)(9), (a)(13), (a)(17), (a)(18)**<br><br>**DEMAND FOR JURY TRIAL** |

COMES NOW, Plaintiff TASHA STACK (hereinafter "Plaintiff"), individually and on behalf of all others similarly situated, for causes of action against Defendants PROGRESSIVE SELECT INSURANCE COMPANY and PROGRESSIVE CASUALTY INSURANCE COMPANY, (hereinafter collectively "Progressive

1

Defendants") and DOES 1 through 50 (hereinafter collectively "Defendants"), complain and allege as follows:

### JURISDICTION AND VENUE

1.      This Court has jurisdiction over this action pursuant to 28 U.S.C.      § 1332, because the amount in controversy as to the Plaintiff exceeds $75,000.00, exclusive of interest and costs, and because Defendants are incorporated and have principal places of business in states and/or foreign states other than the states in which the Plaintiff reside.

2.      This Court also has original jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d), because it is a class action in which: (i) there are 100 or more Class members; (ii) at least one Plaintiff or Class member has a different state of citizenship than Defendant; and (iii) the amount in controversy is more than $5,000,000. This Court is also empowered to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

3.      This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' state law claims because the state law claims and the federal claims are so closely related that they form part of the same case or controversy under Article III of the United States Constitution.

4.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to at least some of Plaintiff's claims occurred, in part, in the Northern District of California, while Plaintiff resides in this district, and because Defendants transact business in this district.

### PARTIES

5.      At all times herein relevant, Plaintiff, TASHA SACK, an individual over the age of 18, was a resident and citizen of the State of California, located within the jurisdiction of the Northern District of California.

6.      At all times herein relevant, Plaintiff is informed and believes, and thereupon alleges, that Defendant PROGRESSIVE CASUALTY INSURANCE

CLASS ACTION COMPLAINT

COMPANY, is, and at all times herein mentioned was, an Ohio Corporation, doing business in the State of California, operating in the State of California and availing itself of the privileges and obligations associated therewith. Defendant PROGRESSIVE CASUALTY INSURANCE COMPANY is an insurance company that provided insurance services to Plaintiff Tasha Stack. It employed adjusters, issued checks and collected premiums relating to the policy attached as Exhibit A. It made all the decisions, policies and procedures concerning the handling of Mr. Stack's claims and all class members.

7.     At all times herein relevant, Plaintiff is informed and believes, and thereupon alleges, that Defendant PROGRESSIVE SELECT INSURANCE COMPANY, is, and at all times herein mentioned was, an Ohio Corporation, doing business in the State of California, operating in the State of California and availing itself of the privileges and obligations associated therewith. PROGRESSIVE SELECT INSURANCE COMPANY is an insurance company that works closely and partners with PROGRESSIVE CASUALTY INSURANCE COMPANY to provide insurance services to the citizens of the State of California.

8.     PROGRESSIVE CASUALTY INSURANCE COMPANY and PROGRESSIVE SELECT INSURANCE COMPANY worked in a partnership in concert with each other. They comingled assets. They used a common marketing and advertising scheme. For all practical purposes these two companies were involved in a joint venture and acted as the agent for the other. According to The Progressive Corporation's 2015 balance sheet, they earned $1,300,500,000.00 after taxes in net income primarily through the insurance business.

9.     The true names and capacities, whether individual, plural, corporate, partnership, associate, or otherwise, of DOES 1 through 50, inclusive, are unknown to Plaintiff who therefore sued said Defendants by such fictitious names.  The full extent of the facts linking such fictitiously sued Defendants is unknown to Plaintiff.  Plaintiff is informed and believes, and thereon alleges, that each of the Defendants designated herein

CLASS ACTION COMPLAINT

as a DOE was, and is, negligent, or in some other actionable manner, responsible for the events and happenings hereinafter referred to, and thereby negligently, or in some other actionable manner, legally and proximately caused the hereinafter described injuries and damages to Plaintiff.  Plaintiff will hereafter seek leave of the Court to amend this Complaint to show the Defendants' true names and capacities after the same have been ascertained.

10.    Plaintiff is informed, believes, and thereon alleges that all defendants, including the fictitious Doe defendants, were at all relevant times acting as actual agents, conspirators, ostensible agents, partners and/or joint venturers and employees of all other defendants, and that all acts alleged herein occurred within the course and scope of said agency, employment, partnership, joint venture, conspiracy and/or enterprise, and with the express and/or implied permission, knowledge, consent, authorization and ratification of their co-defendants; however, this allegation is pleaded as an "alternative" theory wherever not doing so would result in a contradiction with other allegations.

11.    As an alternative theory, Plaintiff is informed and believes, and on that basis alleges, that Defendants are alter egos of each other.  Plaintiff is informed and believes, and on that basis alleges, that there is common control over Defendants, and they operate pursuant to a common business plan.  There is unity of interest among defendants.

12.    The alternative alter-ego relationship among the defendants should be recognized to prevent an injustice.  If the alter-ego relationship among defendants is not recognized, an inequity will result because an entity responsible for wrongdoing will be shielded from liability.  The alter ego relationship should be recognized to ensure effective injunctive and declaratory relief, so that the wrongful practices alleged herein are not relocated to an affiliated company.  If defendants were permitted to avoid an injunction by relocating the misconduct, an inequity would result.

13.    All allegations in this complaint are based on information and belief and/or are likely to have evidentiary support after a reasonable opportunity for further

investigation or discovery.   Whenever allegations in this complaint are contrary or inconsistent, such allegations shall be deemed alternative.

## NATURE OF THE ACTION

14.     Plaintiff incorporates by reference all other paragraphs of this complaint as if fully set forth herein, and further alleges as follows:

15.     This class action arises out of Defendants' fraudulent conduct and deceptive practices of using low-value salvage vehicles to undervalue payments to insureds whose cars have been declared a total loss.

16.     Where the damage to a vehicle following an automobile accident exceeds the cost to repair, the vehicle is deemed a total loss, and consumers are entitled to recover for the reasonable value of the vehicle just prior to the collision. The consumer is paid by her insurer based on finding "comparable automobiles" and using those as the measuring stick to determine the value.

17.     PROGRESSIVE is a conglomerate of several subsidiary companies. PROGRESSIVE uses different underwriting companies for different purposes. However, PROGRESSIVE also administers and manages the claims process using employees from one subsidiary. While one entity may be the underwriter of a particular insurance policy, that policy is administered by the same PROGRESSIVE employees that administer all the claims identically. For example, and PROGRESSIVE claims adjusters handle claims involving several different PROGRESSIVE underwriting subsidiary corporations utilizing the same policies and procedures.

18.     Plaintiff and putative class members allege that, at all relevant times, are insured by the Progressive Defendants for automobile insurance coverage. PROGRESSIVE SELECT INSURANCE COMPANY underwrote Plaintiff's insurance policy which was in effect at all times relevant to this complaint, and is attached hereto as **EXHIBIT A**.

19.     PROGRESSIVE CASUALTY INSURANCE COMPANY, and DOES 4 through 50, administered and facilitated payment to insureds with policies underwritten

CLASS ACTION COMPLAINT

by PROGRESSIVE SELECT INSURANCE COMPANY.

20.     PROGRESSIVE CASUALTY INSURANCE COMPANY takes possession of the vehicles it deems a total loss and takes ownership through title to insureds vehicles from PROGRESSIVE SELECT INSURANCE COMPANY. PROGRESSIVE CASUALTY INSURANCE COMPANY writes any payments for the policies underwritten by PROGRESSIVE SELECT INSURANCE COMPANY. PROGRESSIVE CASUALTY INSURANCE COMPANY administers the entire claims process for PROGRESSIVE SELECT INSURANCE COMPANY. PROGRESSIVE CASUALTY INSURANCE COMPANY determines the policies and procedures which are followed for PROGRESSIVE SELECT INSURANCE COMPANY. PROGRESSIVE CASUALTY INSURANCE COMPANY reaps all or part of the earnings from polices of PROGRESSIVE SELECT INSURANCE COMPANY. PROGRESSIVE CASUALTY INSURANCE COMPANY collects insurance premiums from insureds associated with both underwriting companies.

21.     Mitchell International, Inc. is a third-party provider which provides third party administrative services for claims administration. In this case, Mitchell provided claims services for the Progressive Defendants relating to the valuation of total loss vehicles in the State of California.

22.     Mitchell developed a product called the Mitchell Work Center Total Loss (hereinafter "WCTL"). WCTL is designed specifically to formulate offers to insureds for automobile insurance companies. As the name suggests, WCTL determines what comparable vehicles are used. The WCTL adjusts the price based on what it determines to be the average condition of the car and compares that to the condition of the insured's car.

23.     Since at least 2010, the Progressive Defendants and Mitchell have worked as partners for determining the value of total loss claims.

24.     The Progressive Defendants have outsourced its duty to find "comparable automobiles" for valuation purposes to Mitchell.

CLASS ACTION COMPLAINT

25.     To increase its profit margins, the Progressive Defendants have engaged in unlawful, unfair and deceptive business practices which facilitate and enable them present 'lowball' property damage offers to its insured where there is a total loss situation. To wit, the Defendants prepared false and misleading WCTL reports and submitted "comparable automobiles" to insured for purposes of convincing them to accept a sum that is less than the 'actual value' of the total loss vehicle.

26.     In their scheme to reduce the value of the "comparable automobiles," the Defendants employed deceptive practices, and used methods that constituted outright deception. Defendants used out of market "comparable vehicles." Defendants failed to fairly adjust for differences between "comparable vehicles" and the total loss vehicles. Defendants routinely used as "comparable vehicles" vehicles that had previously been deemed a total loss, without making any adjustments for the differences in the vehicles. Defendants routinely altered the system to adjust the actual value of the vehicle downward.

27.     In other words, the deck was illegally and deceptively stacked against the insureds. The WCTL system would only adjust a vehicles actual value downward. The WCTL system was designed to reject comparable vehicles from insureds. The WCTL system hid behind a regulatory scheme in hopes of shielding themselves of liability, however the wrongful conduct is so egregious that it constitutes fraud and violations of the UCL.

28.     The Progressive Defendants, at all relevant times, had full knowledge that Mitchell was engaging in a scheme to defraud insurers by undervaluing the "comparable automobiles." All the "comparable vehicle" reports prepared by Mitchell are disclosed to the Progressive Defendants. Thus, the Progressive Defendants knew or should have known of this scheme to illegally deflate the "comparable vehicles." Further, the Progressive Defendants cannot contract away its obligations to operate lawfully to Mitchell to increase its profit margins.

29.     Plaintiff and putative class allege that Defendants misled them to believe

7

their claim was lower than what it was actually worth.

30.     Plaintiff brings this class action for Defendants' violations of California's Unfair Competition Laws, California Business & Professions Code ("UCL") §§ 17200, et seq., and California's False Advertising Laws, California Business & Professions Code §§ 17500, et seq.

31.     Plaintiff also brings this class action for violations of the Consumer Legal Remedies Act under Civil Code ("CLRA") section 1770, subdivisions (a)(2), (a)(3), (a)(5), (a)(7), (a)(9), (a)(13), (a)(17), and (a)(18).

32.     Plaintiff further brings this class action against Defendants for fraud, negligent representation, breach of contract, and breach of implied covenant of good faith and fair dealing.

33.     Plaintiff seeks to represent the following class:

> All California residents who are first party insureds of Progressive Insurance and who submitted claims to Progressive for total loss recovery payments and received comparable vehicle information from Progressive or MITCHELL International Inc. for their first party total vehicle property loss during the applicable statute of limitations (four years preceding the filing of this action)

**FACTUAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

34.     Plaintiff incorporates by reference all other paragraphs of this complaint as if fully set forth herein, and further alleges as follows:

35.     At all relevant times, Defendants, and each of them, engaged in various schemes to deflate the value of declared "total loss vehicles" (vehicles where an election is made to forego any vehicle repair) in order to pay first party insureds less than the actual pre-loss value of the total loss vehicle.

36.     Mitchell has for decades worked in the automobile insurance industry

advising and helping insurance companies lower the costs to adjust and settle claims. The WCTL program developed by Mitchell has been adopted by all the California Progressive entities, including the Progressive Defendants.

37.     WCTL is intentionally designed to fraudulently lower the offer made by the Progressive Defendants to their insured. WCTL does this by ignoring pertinent data when it would increase the comparable vehicle price, but by incorporating the same pertinent data when it would decrease the comparable vehicle price. A specific example is the WCTL misrepresents the status of prior salvage vehicles and holds these vehicles out to insured as comparable vehicles.

38.     The Progressive Defendants have a policy of disclosing every Mitchell WCTL report to their insured. Mitchell knows that the reports are distributed to every insured and knows the insured will review and rely upon the reports in making the determination to settle the claim. Mitchell knows that failing to disclose that vehicle is a salvage title is a material misrepresentation and knows that the failure to disclose this information will result in an overall lower payment to the insured.

***Progressive's Scheme***

39.     In every instance of a total loss vehicle claim, the Progressive Defendants check whether the insured's vehicle (the person making the claim) was a salvage title vehicle. They do this because if it was a prior salvage title vehicle, then they would find only other salvage title vehicles to use as a comparable vehicle. This compartmentalization is intentional and specifically designed by Mitchell in order for the Progressive Defendants to evade detection and liability. However, this is part of the broader scheme to ultimately defraud Progressive's insureds.

40.     Another example of the Progressive Defendant's scheme is that the WCTL program "double dips" deductions in its methodology. The WCTL derives an average vehicle condition rating based on the average of all vehicles of that make and model. Then, the WCTL looks at the insured specific vehicle and deducts for areas it deems are below normal wear and tear. This ultimately results in the insured vehicle being rated

down twice. The first is when the WCTL takes the vehicle average rating (which already includes vehicles that may have more wear and tear), and then again reduces the value by the specific wear and tear. Mitchell knows that its program is double dipping and knows that insured will rely upon their WCTL reports but continues to produce and distribute these erroneous reports.

41.     The WCTL also allows the Progressive Defendants and Mitchell to further manipulate the condition rating system, thereby reducing the final payment to the insured. The WCTL has a rating system of 1 through 5, with 5 being the best and 1 being the worst. The WCTL has a series of twelve Condition Adjustments. However, for many vehicles, including Tasha Stack's vehicle, the WCTL system takes all discretion from the adjuster and blocks out the ability of the adjuster to label the vehicle as a 4 or 5, without respect to the condition of the vehicle. Even if the adjuster believes the vehicle warrants a rating of 4 or 5, the WCTL system overrides the discretion of the adjuster and assigns a 3. This is another example of the double dipping process the WCTL system uses to achieve high profits for Progressive.

42.     The Progressive Defendants each represented to its first party insureds, either directly or indirectly through their agents, that it was using "comparable vehicles" to determine the value of the total loss vehicle. Instead, Mitchell, with the knowledge and consent of the Progressive Defendants, employed various schemes to select the 'vehicles' in a manner which allowed them to reduce the calculated value they paid for "total loss vehicles". By affirmatively representing to the Insured that they were using comparable vehicles, when the Progressive Defendants and Mitchell knew or should have known such representation was false, they and their agents misrepresented the essential facts to the first party insured that they were using 'comparable vehicles' in determining the value of the total loss vehicle.

43.     At all relevant times, Progressive and Mitchell had actual knowledge that the representations they made to Tasha Stack and other class members as herein alleged were false. The Progressive Defendants and Mitchell collected and used information

CLASS ACTION COMPLAINT

about whether a comparable car was previously a total loss vehicle. They used this information when it was to their advantage; when the insured car was a prior total loss Progressive and Mitchell used this information to reduce the valuation of the insured's car. However, when the comparable vehicle was being offered, the Progressive Defendants and Mitchell suppressed the information and failed to properly adjust the value of the car.

44.     One scheme Mitchell engaged in, with the consent and knowledge of the Progressive Defendants, was to use vehicles with salvage titles as a "comparable vehicle" without disclosing the fact that they were salvage vehicles, and without making any adjustment for the fact that it used a salvage vehicle as a comparable.

45.     In a second scheme, Mitchell, with the consent and knowledge of the Progressive Defendants, had a pattern and practice of representing to insured that it obtained a 'dealer quote' from a local dealer. In fact, Mitchell had a practice to not contact licensed dealers to obtain a quote and to simply make up numbers to serve the needs of the Progressive Defendants.

46.     In a third scheme, the Progressive Defendants had a policy of ignoring "comparable vehicles" from licensed dealers that it deemed to be priced too high. The Progressive Defendants, through Mitchell, would instead use non-compliant "comparable vehicles" whose representation as a "comparable vehicle" was were either fabricated, a deflated value vehicle, a preciously used total loss vehicles (i.e., salvage vehicle), or through some other misrepresentation concerning the "comparable vehicles". There is no basis in law or in the contract between the Progressive Defendants and their insured that support determining actual cash value by excluding comparable vehicles that the Progressive Defendants deems too high.

47.     In a Fourth scheme, the Progressive Defendants and Mitchell had a policy of ignoring the Insured's purchase price for the vehicle; even when the purchase was made during the time frame in which other supposedly "comparable vehicles" were considered.

CLASS ACTION COMPLAINT

1

## **PLAINTIFF'S ALLEGATIONS**

2       48.     On or about July 2009, Plaintiff Tasha Stack purchased a 2009 Honda Civic

3  EX (VIN number 2HGFA16939H528385) (hereinafter "Subject Vehicle") for

4  approximately $25,000.00.

5       49.     At all relevant times, Plaintiff insured her 2009 Honda Civic with

6  Progressive Defendants' automobile insurance policy which included full comprehensive

7  coverage, **Policy Number 60860574** (hereinafter "Subject Policy").

8       50.     Attached hereto this Complaint, and as **Exhibit A**, is a true and correct

9  copy of the automobile insurance policy the Progressive Defendants issued to Plaintiff

10 Tasha Stack for her 2009 Honda Civic. Specifically, the contract between the Progressive

11 Defendants and Plaintiff stated the Progressive would "pay for sudden, direct and

12 accidental loss to a: covered auto."

13      51.     At all relevant times the insurance policy attached as **Exhibit A** had the

14 following relevant clauses in effect:

15      • "If you pay the premium for this coverage, we will pay for sudden, direct

16         and accidental loss to a:

17              i.      Covered auto, including an attached trailer; or

18              ii.     Non-owned auto;

19         and its custom parts or equipment, resulting from the collision.

20      • "The limit of liability for loss to a covered auto, non-owned auto, or

21         custom parts or equipment is the lowest of:

22              i.   The actual cash value of the stolen or damages property at the

23                   time of the loss reduced by the applicable deductible;

24              ii.  The amount necessary to replace the stolen or damages

25                   property reduced by the applicable deductible;

26              iii. The amount necessary to repair the damages property to its

27                   pre-loss condition reduced by the applicable deductible; or

28

CLASS ACTION COMPLAINT

    iv.  The State Amount shown on the declarations page for that covered auto."

- "To determine the amount necessary to repair or replace the damages property as referred to in subsection 1, the total cost of necessary repair or replacement may be reduced by unrepaired prior damage. Unrepaired prior damage included broken, cracked or missing parts; rust; dents; scrapes; gouges; and peeling paint. The reduction for unrepaired prior damage is the cost of labor parts and materials necessary to repair or replace damage, deterioration, defects, or wear and tear on exterior body parts, windshields and other glass, wheels, and paint, that existed prior to the accident and that is eliminated as a result of the repair or replacement of property damage in the loss."

- "To determine the amount necessary to repair or replace the damages property as referred to in subsection 1, an adjustment may be made for betterment or depreciation and physical condition on:
  - i.  batteries;
  - ii.  tires;
  - iii.  engines and transmissions, if the engine has greater than 80,000 miles, and
  - iv.  any other mechanical parts that are nonfunctioning or inoperative."

- "The actual cash value is determined by the market value, age, and condition of the vehicle at the time the loss occurs."

- "We may, at our option:
  - i.  pay for the loss in money; or
  - ii. repair or replace the damaged or stolen property."

- "We may use estimating, appraisal, or injury evaluation systems to assist us in adjusting claims under this policy and to assist us in determining the

amount of damages, expenses, or loss payable under this policy. Such systems may be developed by us or a third party and may include computer software, databases, and specialized technology."

- "If any provision of this policy fails to conform to the statues of the state listed on your application as your residence, the provision shall be deemed amended to conform to such statues. All other provisions shall be given full force and effect. Any disputes as to the coverages provided or the provisions of this policy shall be governed by the law of the state listed on your applicable as your residence."

52.   Through the terms of the policy, both those alleged herein, and those terms contained in Exhibit A, the Progressive Defendants breached the terms of the policy by failing to adhere to the most basic standards incorporated into the policy. The Progressive Defendants had a policy of not paying actual cash value for total loss vehicles as a result the misrepresentations they made to their insured.

53.   The Progressive Defendants know that their insureds making total vehicle loss claims usually suffer bodily injuries, lose time from work, and, in some circumstances, have lost their only means of transportation. As a result of these extenuating circumstances, Progressives' insureds are often at a severe disadvantage when it comes to settling and negotiating their claims. For those making a claim against the Progressive Defendants, they need to resolve the claim as quickly as possible, even if it is for a loss, because they have to try to get back on their feet as soon as possible.

54.   Plaintiff purchased the Subject Policy from an organization which held itself out as "Progressive." She accessed her information and statements at progressive.com. She made timely payments to "Progressive." She emailed with representatives whose email contained the "@progressive.com" email address. In fact, it was PROGRESSIVE CASUALTY INSURANCE COMPANY that performed these functions, in a joint venture with PROGRESSIVE SELECT INSURANCE COMPANY, and perhaps other Progressive entities.

55.     On or about February 9, 2018, Plaintiff Stack's husband, Alexander Stack, an authorized user under the Subject Policy, was driving the Subject Vehicle when he was involved in a multi-vehicle collision in San Francisco, CA.

56.     As a result of the collision, Mr. Stack sustained injuries to the inside of his mouth and lip.

57.     On or about February 9, 2018, Mr. Stack opened a claim with the Progressive Defendants for the property damage related to the Subject Vehicle and to recover the reasonable value of the Subject Vehicle prior to the collision, **Claim Number 18-470773**.

58.     The Progressive Defendants accepted Plaintiff's claim, deemed the Subject Vehicle a "total loss," and attempted to negotiate a settlement with her.

59.     As part of the settlement negotiations, the Progressive Defendants have a policy and practice of emailing the Mitchell Work Center Total Loss reports to its insureds every time there is a total loss claim.

60.     On or about February 13, 2018, Mr. Stack spoke with a Progressive representative and employee, Caitlin Korte, regarding the status of the claim. Later that day, Ms. Korte sent Mr. Stack a Valuation Report (Exhibit B) prepared by Mitchell that included eleven "comparable vehicles" which were used by the Progressive Defendants to formulate their settlement offer (the Settlement Summary is attached hereto as **Exhibit C**).

61.     All relative times, Caitlin Korte was an authorized agent and employee of the Progressive Defendants and acted within the course and scope of employment

62.     Based on the WCTL valuation report, the Progressive Defendants made a full and final offer to settle Plaintiff's claim for $4,675.82, which was $20,324.18 less than what Plaintiff paid for the Subject Vehicle and less than the amount promised under the Subject Policy.

63.     One of the vehicle's listed in the Valuation Report and relied on by the Progressive Defendants was a 2009 Honda Civic, VIN 2HGFG12899H537278, from

Gilroy, California, was represented by the Progressive Defendants and Mitchell as a "comparable vehicle." Defendants asserted that this "comparable vehicle," after adjustments, was worth $6,740.38. However, the vehicle was in fact a prior 'total loss vehicle' (aka "salvage title").

64.     On information and belief, Plaintiff asserted that she had purchased the vehicle on or about May 2009 for approximately $25,000.00 and requested that the Progressive Defendants use that list price as the comparable vehicle. However, in line with their policy and practice, the Progressive Defendants refused to consider this sale as a comparable vehicle.

65.     Instead, Mitchell obtained eleven other "comparable vehicle" quotes through the WCTL program, **Claim Number 18-4707773-01** (attached hereto as "Exhibit B" is the Valuation Report.)

66.     PROGRESSIVE CASUALTY INSURANCE COMPANY and Mitchell are in the business of tracking "salvage vehicles" and have easy access to databases which quickly and efficiently identify such vehicles as being salvaged. The Progressive Defendants and Mitchell consistently use such information to set rates and determine (i.e. reduce) payment benefits when a previously salvaged vehicle suffers another loss.

67.     The Progressive Defendants never disclosed the fact that the 2009 Honda Civic, VIN 2HGFG12899H537278, was a prior total loss vehicle to Plaintiff, and the price was never adjusted for in the appraisal determination, despite the Progressive Defendants having full knowledge this was a prior total loss vehicle.

68.     Due to the nature of the Progressive Defendants' business, they knew that they were passing off salvage titled vehicles as non-salvage title vehicles to their insured.

69.     Four other "comparable vehicles" Mitchell used were alleged quotes from dealers all over California as opposed to dealers within 75 miles of Plaintiff's residence (Dublin, Petaluma, Santa Rosa and Davis). Mitchell claimed they obtained quotes from Dublin Honda, Hansel Honda, Hansel BMW of Santa Rosa, and University Honda for $7,446.71, $7,063.69, $7,044.57.00 and $$7,888.47 respectively. However, Mitchell

never actually obtained a quote from these licensed dealers, or any other licensed dealer and thus misrepresented their claims to both Plaintiff and the dealers and failed to otherwise use good faith and fair dealing in this valuation method.

70.     The remaining six "comparable vehicles" were based on dealer website listings from CARS.com, VAST.com, and TRUECAR.com.

71.     Between February 9, 2018 and about April 2018, a series of telephone conversations and emails took place between Mr. Stack, Progressive representatives and Michell representatives whereby Mr. Stack continuously disputed the Progressive Defendants' value of the Subject Vehicle and thus attempted to obtain a fair valuation for total loss of the subject vehicle.

72.     On or about February 19, 2018, Mr. Stack spoke with Lauren Kallerman, another Progressive representative, to refute the conditioning adjustment that was done and dispute the comparable value listed in the Valuation Report.

73.     All relative times, Lauren Kallerman was an authorized agent and employee of the Progressive Defendants and acted within the course and scope of employment

74.     On or about February 21, 2018, Mr. Stack sent Ms. Kallerman approximately twenty-five (25) separate cars 'for sale' listings as comparable vehicles for Progressive to consider, which he believed more accurately reflected the value of the Subject Vehicle. However, Progressive refused to consider the comparable vehicles provided by Mr. Stack.

75.     Instead, on or about February 23, 2018, Ms. Kallerman forwarded Mr. Stack a copy of Mitchell's report that allegedly listed two additional "comparable vehicles" to the Subject Vehicle both of which were not located in California and were not within 75 miles of Plaintiff's location as allegedly required by Progressive. The first vehicle, VIN 2HGFA16969H337060 listed as a private owner sale in Newton County, Georgia (30016) and the second, VIN 19XFA16989E001064 listed for sale at 'GT Motors, INC' in Philadelphia, Pennsylvania.

76.     On or about February 27, 2018, Mr. Stack spoke with a Progressive

Supervisor, Carlos Hernandez, to discuss the dealer quotes that allegedly reflected the value of the Subject Vehicle. Mr. Stack, again, vocalized his concern with Progressive's evaluation and mentioned inaccuracies in Ms. Kellerman's condition assessment

77.     On or about February 28, 2018, Ms. Hernandez emailed Mr. Stack informing him that Progressive stood by his dealer quotes and refused to revise the conditioning assortment or the total loss evaluation, in reliance on the Mitchell policy. Specifically, Mr. Hernandez stated,

"I'm reaching out to you following our conversation yesterday regarding the Total Loss evaluation for your 2009 Honda Civic. You mentioned inaccuracies in Lauren's conditioning assessment and I just finished doing a reinspection of your vehicle. Most of the ratings that Lauren had for your vehicle were accurate. I'm sending you the initial evaluation showing what those ratings were. On that initial report you will find downgrades for the Door Interior Panels (rated as all 4), Seats, Glass and Exterior Trim. The damages she saw then and I saw now were not nitpicky, but rather obvious damages that could not be ignored and had to be downgraded.

When I referred to as a most ratings being accurate, I did find 2 areas that Lauren did not rate correctly and that was the Body and Paint for your vehicle (pics attached). Your vehicle was very dirty at the time of her inspection so I wiped it and cleaned it to ensure an accurate assessment this time. Your left front door has been painted before and there is a large paint run below the moulding. That is considered poor workmanship so a downgrade was warranted. The right hinge pillar has an area with thick rust that she once again missed and should've been downgraded, plus there was a large dent/crease on the right rear door.

Now, I won't be making any revisions to the conditioning, which would actually make the value lower in price. I hope that you see this decision as a sign of me trying to work this out with you and that I'm trying to be fair. You may not agree with Mitchell's conditioning rationale, but we discussed it's something that Lauren and I have to abide by and use that for every car we inspect. I know you wanted to possibly meet in person to

review the damages but that will not cause me to change the value or outcome of this claim since the 150+ pics I've taken shows the right conditioning rating was completed.

At this point, we're deeming the value on your car as $7175.82, but you think that your car is worth $8500. I explained yesterday that disagreements happen at times and that's why you have the Appraisal Clause in your policy. I'm attaching that policy language which confirms what you and I talk yesterday. Your family have been Progressive customers for a long time and we value your loyalty. I wish there was something I could do to bring up the value for you but there is nothing I can do for you."

78.     Mr. Hernandez's statements were false, and in a direct misrepresentation of California law (both common law fraud, and violations of the California Insurance Code). Thus, Plaintiff relied upon Mr. Hernandez's statements in settling her claim.

79.     All relative times, Carlos Hernandez was an authorized agent and employee of the Progressive Defendants and acted within the course and scope of employments.

80.     On or about April 02, 2018, Mr. Stack sent Ross Kool, a Progressive Claims Supervisor, additional comparable vehicles for the Progressive Defendant to consider.

81.     All relative times, Ross Kool was an authorized agent and employee of the Progressive Defendants and acted within the course and scope of employment

82.     At all times, the Progressive Defendants' agents and employees relied upon the Mitchell WCTL reports in determining actual cash value and in negotiating with customers. This reliance led to the adjusters appearing to act in good faith and trying to get the 'most' for the insureds. This reliance was relied upon by the Progressive Defendant's insureds and caused them to accept low ball offers because of the obstacles and time constraints to get a fair offer.

83.     During the email communications, Progressive representatives disclosed the Mitchell valuation reports upon which the Progressive Defendants based their lowball settlement claim offer. Mr. Stack reviewed the Mitchell valuation reports before agreeing to settle his total loss claim with Progressive. The Mitchell valuation reports used

comparable vehicles, as alleged herein. At the time, Mr. Stack was not aware that the representations made by the Progressive representatives were in fact false.

84.     The Progressive representatives relied upon the WCTL reports relating to the Tasha Stack matter. In that reliance, Ms. Korte was forced to accept the WCTL valuation report, and could only offer a certain amount of money, up to his limit. Plaintiff had no choice but accept the lowball offer, and suffer the approximately $700 loss, or go through a long and costly process.

85.     The Progressive Defendants know that their insureds, when faced with this choice, will more often chose to settle and suffer the relatively small loss. The small loss per insured adds up to big gains for the Progressive Defendants.

86.     Mitchell at all times knew that the representations made by the Progressive Defendants' agents were false.

87.     Mitchell knew the reports and information were going to be used and relied upon by the Progressive Defendants' agents in determining whether the actual cash value for each total loss vehicle.

88.     Each of the Progressive Defendants' adjusters had no discretion to deviate from the actual cash value produced by the Mitchell WCTL system. The actual cash value produced by the WCTL system completely controlled the amount the adjuster could offer the insureds.

89.     On information and belief, Mr. Stack submitted the purchase price of the Subject Vehicle as a comparable vehicle to the Progressive Defendants. Then Ms. Korte contacted Mitchell to determine whether they could consider this as a comparable vehicle. Mitchell advised Ms. Korte that Mitchell would not accept this as a comparable.

90.     Based on these and other misrepresentations, Plaintiff was induced to accept a reduced valuation of her 2009 Honda Civic. Plaintiff reasonably believed the Progressive representatives were telling the truth, both when she said they could not consider a reasonable comparable from Mr. Stack, and with regard to Mitchell's valuation reports.

CLASS ACTION COMPLAINT

91.    In an attempt to get a fair price, Mr. Stack reviewed the Mitchell reports and determined that the valuation was based on of the "comparable vehicles." Mr. Stack requested that Progressive provide him with the quotes they received from the independent dealers they contacted for comparisons. Progressive never provided said quotes and Plaintiff, on information and belief, determined Progressive and Mitchell had never even contacted the dealers. Even after Mr. Stack presented this information to Ms. Kallerman who took no action to remedy the false and misleading information he was relying on to determine the fair market value. Mr. Stack was not aware of several other material false representations, such as the salvage title, the failure to consider a reasonable comparable, misrepresentations of the law regarding comparable vehicles, misrepresenting the condition of the vehicle, unlawfully double dipping reductions using the vehicle condition system, and other false and misleading practices.

92.    The fact that the Progressive Defendants and their representatives continued to rely on the Mitchell WCTL reports even after the distance and dealer market survey reports were examined is evidence of the Progressive Defendants' policy to systematically rely on false and misleading data to low-all their insured.

93.    Ms. Korte made a final offer to value Plaintiff's vehicle at $4,675.82. Based on the representations as alleged above, Plaintiff accepted the final valuation made by Mitchell's WCTL to finalize her claim. At the time of acceptance, Plaintiff and Mr. Stack did not know of all the false representations made by the Progressive Defendants and their agents.

94.    Aside from the market survey reports and the distance of two of the vehicles, Plaintiff was unaware of any other misrepresentations. Plaintiff did not know that the law in fact requires the Progressive Defendants to consider a comparable vehicle sold in the last 60 days. The Progressive Defendants, through their representatives, expressly stated they *could not* consider such a comparable. This is a false statement made intended to induce Plaintiff to accept the offer. At the time, Plaintiff did not know the Honda Civic from Gilroy, CA was in fact a salvage title vehicle. She relied upon the

report to the extent she believed this was a comparable vehicle. Plaintiff was unaware that Mitchell double dipped in its condition evaluation system, and that the adjusters had no discretion to give a higher rating when in fact a vehicle deserved a higher rating. These and other misrepresentations were relied upon by Plaintiff when she was determining whether to accept the Progressive Defendants' lowball offer.

95.     In fact, the fair market value of Plaintiff's vehicle at the time of the crash was significantly higher than the final offer by Progressive. If Mitchell had made accurate representations about the comparable it asserted in this case, Plaintiff would have recovered a significantly higher amount from the Progressive Defendants pursuant to the automobile policy. The fair market value that Progressive would have offered had Mitchell not provided fraudulent comparable vehicles would have been significantly higher than $4,675.82.

96.     The Progressive Defendants operate on an unequal playing field, compared to its customers and insured. The Progressive Defendants write the policies, have access to vast amounts of information and finances, and has teams of lawyers should a claim be litigated. Insureds on the other hand, usually do not have the knowledge necessary to adequately determine if the value Mitchell is assigning to the total loss vehicle is fair. Insureds, having just lost the use of their vehicle, are at a significant bargaining disadvantage when the Progressive Defendants offer compensation based on incomparable vehicles because the Insured frequently depend on the immediate payment of money in order to secure a replacement vehicle so they can get themselves or others to school, work or otherwise handle their daily responsibilities.

97.     All of the Progressive Defendants' and Mitchell's acts as herein alleged, were done with the prior approval of, with the knowledge of, and/or the express direction or ratification of an officer, director, or managing agent of the Progressive Defendants.

98.     The policy by Mitchell to not disclose a salvage title on its WCTL reports was intentionally orchestrated by Mitchell and the Progressive Defendants to use smoke and mirrors to hide its fraudulent reports and deceive insured. The Progressive

CLASS ACTION COMPLAINT

Defendants have a policy of checking the insured vehicles to see if it is salvage title, yet Mitchell somehow does not include that important item on its report. This was intentionally created by the Progressive Defendants to avoid detection. Mitchell's policy of taking away discretion from adjusters when conditioning the vehicles was made by the officers, directors and managing agents of the Progressive Defendants and Mitchell in an effort to increase profits.

99.     Even after the Progressive Defendants were notified by Mr. Stack that the Mitchell reports contained some inaccuracies, and those concerns were raised to the managing agents, the Progressive Defendants continued to follow their policies of relying on false and fraudulent data in making their offers to insured.

## **CLASS ACTION ALLEGATIONS**

### *Class Definition*

100. Plaintiff brings this action on behalf of herself, on behalf of all others similarly situated, on behalf of the General Public, and a member of the Class, defined as follows:

**Injunctive Relief Class:** All California residents who are first party insureds of Progressive Insurance and who submitted claims to Progressive for total loss recovery payments and received comparable vehicle information from Progressive or Mitchell International Inc. for their first party total vehicle property loss during the applicable statute of limitations (four years preceding the filing of this action.)

**Restitution Subclass(es):**

1.  The First Party Insureds of the Progressive Defendants who, as California Residents, did not receive adequate compensation for their first party total vehicle property loss during the four years preceding the filing of the action because the Progressive Defendants used vehicles with salvage titles as a "comparable vehicle" without disclosing the fact that they were salvage

CLASS ACTION COMPLAINT

vehicles, and without making any adjustment for the fact that it used a salvage vehicle as a comparable.

2.  The First Party Insureds of the Progressive Defendants who, as California Residents, did not receive adequate compensation for their first party total vehicle property loss during the four years preceding the filing of the action because Progressive Defendants and Mitchell failed to properly seek, use and report market dealer survey reports.

3.  The First Party Insureds of the Progressive Defendants who, as California Residents, did not receive adequate compensation for their first party total vehicle property loss during the four years preceding the filing of the action because the Progressive Defendants and Mitchell ignored "comparable vehicles" from licensed dealers that it deemed to be priced too high.

4.  The First Party Insureds of the Progressive Defendants who, as California Residents, did not receive adequate compensation for their first party total vehicle property loss during the four years preceding the filing of the action because the  Progressive Defendants and Mitchell ignored the Insured's purchase price for the vehicle when the purchase was made during the time frame in which other supposedly "comparable vehicles" were considered.

5.  The First Party Insureds of the Progressive Defendants who, as California Residents, received comparable vehicle information from the Progressive Defendants or Mitchell International Inc. for their first party total vehicle property loss during the four years preceding the filing of this action.

6.  The First Party Insureds of the Progressive Defendants who, as California  Residents,  received  comparable  vehicle  information

from the Progressive Defendants or Mitchell for their first party total vehicle property loss during the four years preceding the filing of this action wherein those reports contained condition reports which were improperly categorized and resulted in lower vehicle valuations.

7.  The First Party Insureds of the Progressive Defendants who, as California Residents received less than actual cash value for their claim within the four-year period preceding the filing of this action based on improper Mitchell WCTL condition valuation process, aka 'double dipping'.

8.  Excluded from the Classes are: Defendants, any entities in which they have a controlling interest, any of their parents, subsidiaries, affiliates, officers, directors, employees and members of such person's immediate families, and the presiding judge(s) in this case and his, her or their immediate family

9.  Plaintiff reserves the right to amend or otherwise alter the class definitions presented to the Court at the appropriate time, or to propose or eliminate sub-classes, in response to facts learned through discovery, legal arguments advanced by Defendant, or otherwise.

10.  This action has been brought and may be properly maintained as a class action pursuant to the provisions of Code of Civil Procedure section 382 and other applicable law.

### *Numerosity of the Class:*

101.    Pursuant to Code of Civil Produce section 382 ("C.C.P. § 382"), members of the Class are so numerous that their individual joinder is impracticable.  On information and belief, Plaintiff estimates that the class consists of hundred, if not thousands, of individuals throughout the State of California, and is so numerous that

joinder of all members would be impracticable. The precise number of members of each of the Classes and their addresses are known to Plaintiff or will be known to Plaintiff through discovery.  Members of the Class may be notified of the pendency of this action by mail, electronic mail, the Internet, or published notice.

***Existence of Predominance of Common Questions of Fact and Law:***

102.    Pursuant to C.C.P. § 382, common questions of law and fact exist as to all members of the Classes.  These questions predominate over any questions affecting only individual class members. These common legal and factual questions include:

a.   Whether Progressive disclosing all relevant information relating to "comparable vehicles" it uses for total loss vehicles;

b.   Whether the "comparable vehicles" Progressive used were in fact "comparable vehicles";

c.   Whether Progressive had a business practice to reduce total vehicle loss payments by application of a statistical or mathematical method that was not authorized by the Policy;

d.   Whether Progressive took unreasonable deductions from "comparable vehicles" in its calculation of the total loss vehicles;

e.   Whether Progressive had a business practice to reduce payments for total loss vehicles based on using improper "comparable vehicles" in its calculation for the total loss vehicles;

f.   Whether Progressive and MITCHELL failed to adjust the price of "comparable vehicles" based on significant deviating factors;

g.   Whether Progressive fails to disclose material facts about the "comparable vehicles" in it calculation for the total loss vehicles;

h.   Whether Progressive's use of MITCHELL International and its software to determine "comparable vehicles" and calculate the value of total loss vehicles constituted fraud;

i.  Whether Progressive's use of MITCHELL International and its software to determine "comparable vehicles" and calculate the value of total loss vehicles constituted breach of contract;

j.  Whether Progressive's use of MITCHELL International and its software to determine "comparable vehicles" and calculate the value of total loss vehicles constituted an unfair and unlawful business practices;

k.  Whether Progressive's use of MITCHELL International and its software to determine "comparable vehicles" and calculate the value of total loss vehicles constituted negligent misrepresentation;

l.  Whether Progressive and MITCHELL's "comparable vehicle" representations to its insured were made with the intent to defraud its customers;

m.  Whether Progressive and MITCHELL's refusal to accept as "comparable vehicle" the purchase price of the insured vehicle where the vehicle was purchased within 90 days of the date of loss;

n.  Whether Progressive and MITCHELL conspired to reduce the amount Progressive paid in claims for total loss vehicles through a process of not fully disclosing all relevant information for its proposed "comparable vehicles";

o.  The nature and extent of the knowledge Progressive had of the scheme MITCHELL implemented;

p.  Whether MITCHELL improperly obtained quotes from dealers to use as a "comparable vehicle";

q.  Whether MITCHELL profited directly from lowering the "total loss vehicle" price;

r.  Whether MITCHELL and Progressive intentionally schemed to unlawfully reduce the total payments to insured for "total loss vehicles."

CLASS ACTION COMPLAINT

103.   These questions of law or fact common to the Class overwhelmingly predominate over any individual issues, such that by prevailing on its own claims, Plaintiff will necessarily establish Defendant's liability as to all Class members.

***Typicality:***

104.   Plaintiff's claims are typical of those of the class he seeks to represent and will fairly and adequately represent the interests of the class and subclass. Plaintiff is represented by counsel competent and experienced in both consumer protection and class action litigation.

***Adequacy of Representation:***

105.   Plaintiff can and will fairly and adequately represent and protect the interests of the Class.

106.   The claims of Plaintiff are substantially similar, if not identical, to those of absent Class members. Without the Class representation provided by Plaintiff, no Class members will receive legal representation or redress for their injuries.

107.    Plaintiff and Class counsel have the necessary financial resources to adequately and vigorously litigate this class action. Plaintiff and Class counsel are aware of their fiduciary responsibilities to Class members and are determined to diligently discharge those duties by venously seeking the maximum possible recovery for the Class.

***Superiority:***

108.   A class action is superior to other methods for the fair and efficient adjudication of this controversy. Because the damages suffered by the individual class members are small compared to the expense and burden of litigation, it would be impracticable and economically unfeasible for class members to seek redress individually. The prosecution of separate actions by the individual class members, even if possible, would create a risk of inconsistent or varying adjudications with respect to individual class members against Defendant, and would establish incompatible standards of conduct. Further, a class action is in the interests of justice because many class members are likely unaware that Progressive and Mitchell's conduct is illegal, are

CLASS ACTION COMPLAINT

unaware of the scope and extent of the Progressive/Mitchell scheme, and lack the financial and informational resources to protect their rights.

109.    Alternatively, the class should be certified because:

    a.   The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members the Class which would establish incompatible standards of conduct for Defendant;

    b.   The prosecution of separate actions by individual members of the Class would create a risk of adjudication with respect to them, which would, as a practical matter, be dispositive of the interests of the other members of the Class not parties to the adjudications, or substantially impair or impede their ability to protect their interests; and

    c.   Defendants have acted or refused to act on grounds generally applicable to the Class, and/or the general public, thereby making appropriate final and injunctive relief with respect to the classes as a whole.

## FIRST CAUSE OF ACTION

## VIOLATION OF CALIFORNIA BUSINESS AND PROFESSIONS CODE §§ 17200, et seq. ("UNFAIR COMPETITION LAW")

**(By Plaintiff and the Class against All Defendants and Does 1-50, inclusive)**

110.    Plaintiff re-alleges and incorporates herein by reference each and every allegation and statement contained in the prior paragraphs, as though fully set forth herein.

111.    Business and Professions Code § 17200 et seq., often referred to as the "Unfair Competition Law" or "the UCL," defines unfair competition to include any unlawful, unfair, or fraudulent business act or practice. The UCL provides that a court may order injunctive relief and restitution as remedies for any violations of the UCL.

112.    Beginning on an exact date unknown to Plaintiff, but at all times relevant herein and during the four years preceding the filing of the Complaint in this action, Progressive and MITCHELL committed and they continue to commit acts of unfair

competition proscribed by the UCL, including the practices alleged herein in connection with the valuation of claims made on first party insurance claims total loss vehicles.

113.    The business acts and practices alleged herein constitute unfair business practices in that said acts and practices offend public policy and are substantially injurious to the public. The acts and practices of Progressive and MITCHELL violate California public policy that is tethered to regulations governing persons engaged in the practice of adjusting claims on automobile insurance policies. For example, the unfair Trade Settlement Practices Regulations, set forth in 10 C.C.R. 2695.6, et seq. were promulgated in order to promote the good faith, prompt, efficient and equitable settlement of claims on a cost-effective basis. 10 C.C.R. §2695.1(2).

114.    The business acts and practices alleged hereinabove also violate the public policies against misrepresentation and fraud by automobile insurance companies, and their agents, to its insureds.

115.    The business acts and practices alleged herein constitute fraudulent business practices in that said acts and practices are likely to deceive members of the public as to their legal rights and obligations, and by use of such deception, may preclude such individuals from exercising legal rights to which they are entitled. In particular, Defendants' false communications which misuse "comparable vehicles" and the devaluation of total loss vehicle are submitted to its insured, and is meant to be relied upon by its insured. The information it provides is known to be untrue or deceitful, and intended to induce the insured to settle for a reduced valuation.

116.    The unlawful, unfair and fraudulent business acts and practices of the Progressive Defendants described herein present a continuing threat to the public in that Progressive is currently engaging in such acts and practices, and will persist and continue to do so unless and until an injunction is issued by this Court.

117.    Based on the language and communications from Progressive and Mitchell, Plaintiff reasonably believed she had no reasonable option but to accept the amount offered by Progressive for her 2009 Honda Civic.

CLASS ACTION COMPLAINT

118.     As a direct and proximate result of the acts and practices described herein, Progressive and its agents have received and collected money from Plaintiffs and class members and failed to fairly pay for claims made by those class members. The Progressive Defendants should be ordered to provide full and complete restitution of all amounts collected from class members.

119.     Pursuant to Business and Professions Code § 17203, Plaintiff seeks an order enjoining Progressive and MITCHELL from engaging in such acts and practices as hereinabove alleged and providing appropriate restitution to Plaintiff and members of the class.

120.     Pursuant to Code of Civil Procedure § 1021.5, Plaintiff seeks recovery of attorneys' fees, costs and expenses incurred in the filing and prosecution of this action. Plaintiff does not seek any relief greater than or different from the relief sought for the class.

121.     WHEREFOFRE, Plaintiff seeks all remedies available under Section 17200 of the California Business and Professions Code, including restitutionary and injunctive relief, as well as attorneys' fees and costs.

## SECOND CAUSE OF ACTION

## FRAUD

### (By Plaintiff and the Class against All Defendants and Does 1-50, inclusive)

122.     Plaintiff incorporates each of the foregoing paragraphs as though fully set forth herein, and further allege as follows.

123.     The Progressive Defendants intentionally and knowingly made false statements to Tasha Stack about the value of her car to induce her to accept a reduced amount on her automobile insurance claim.

124.     Tasha Stack reasonably relied upon the misrepresentations.

125.     Tasha Stack suffered monetary damage as a direct result.

126.     WHEREFORE, Plaintiff prays for declaratory and injunctive relief as set forth below.

CLASS ACTION COMPLAINT

**THIRD CAUSE OF ACTION**

**NEGLIGENT MISREPRESENTATION**

**(By Plaintiff and the Class against All Defendants and Does 1-50, inclusive)**

127.    Plaintiff incorporates each of the foregoing paragraphs as though fully set forth herein, and further allege as follows.

128.    The Progressive Defendants negligently made false statements to Tasha Stack about the value of her car to induce her to accept a reduced amount on her automobile insurance claim.

129.    Tasha Stack reasonably relied upon the misrepresentations.

130.    Tasha Stack suffered monetary damage as a direct result.

131.    WHEREFORE, Plaintiff prays for declaratory and injunctive relief as set forth below

**FOURTH CAUSE OF ACTION**

**BREACH OF CONTRACT**

**(By Plaintiff and the Class against Progressive Defendants and Does 1-50, inclusive)**

132.    Plaintiff incorporates each of the foregoing paragraphs as though fully set forth herein, and further allege as follows.

133.    Progressive agreed to pay Tasha Stack for the reasonable value of her vehicle if it was a total loss vehicle, based on the contract contained in Exhibit A, and the provisions alleged herein.

134.    Progressive breached this contract by misrepresenting material facts to Mrs. Stack. Detriment, and failing to pay the reasonable value for the claim.

135.    Progressive breached the contract by not utilizing claims reviews policies within the requirements set forth in this policy, attached as Exhibit A.

136.    Progressive breached the contract by failing to adhere to the California Insurance Code total loss vehicle requirements which were incorporated into the contract.

137.    As a result, Mrs. Stack accepted less than his vehicle was worth, and was otherwise damages.

1  138.  WHEREFORE, Plaintiff prays for relief as set forth below.

2  **FIFTH CAUSE OF ACTION**

3  **BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**

4  **(By Plaintiff and the Class against Progressive Defendants and Does 1-50, inclusive)**

5  139.  Plaintiff incorporates each of the foregoing paragraphs as though fully set

6  forth herein, and further allege as follows.

7  140.  At all times herein mentioned, Progressive knew, or in the exercise of good

8  faith reasonably should have known that Plaintiff was legally entitled to recover the

9  benefits under the aforementioned insurance policy, and the Progressive was obligated to

10  provide Plaintiff with benefits under the insurance policy.

11  141.  Progressive intentionally, maliciously, and oppressively conducted

12  themselves willfully and wrongfully and refused, and failed, to pay the benefits of the

13  policy to Plaintiff, despite the fact that the benefits under the policy were due and payable

14  to the Plaintiff and the Plaintiff was entitled to the full benefits of the policy.

15  142.  Progressive unreasonably failed to pay Plaintiff's claim for benefits under

16  the total loss vehicle provisions of his policy under the policy. All of Progressive's acts as

17  herein alleged, were done with the prior approval of, with the knowledge of, and/or the

18  express direction or ratification of an officer, director, or managing agent of Progressive,

19  consistent with the definitions contained in *California Code of Regulations,* Title 10,

20  Section 2695.12.

21  143.  As a proximate result of Progressive's wrongful conduct, as

22  aforementioned, Plaintiff has been denied the reasonable value for his total loss vehicle.

23  144.  Progressive's actions in wrongfully reducing the value of total loss

24  vehicles, as aforementioned herein, constituted a pattern and practice of Progressive,

25  which is designed to wrongfully withhold payment of claims with the intent of ignoring

26  the interest of their insured.

27  145.  WHEREFORE, Plaintiff prays for relief as set forth below.

28  / / /

33

CLASS ACTION COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**SIXTH CAUSE OF ACTION**

**VIOLATION OF CONSUMER LEGAL REMEDIES ACT (Civ. Code §§ 1770, et seq.)**

**(By Plaintiff and the Class against Defendants and Does 1-50, inclusive)**

146.    Plaintiff incorporates each of the foregoing paragraphs as though fully set forth herein, and further allege as follows.

147.    This claim is brought by Plaintiffs on behalf themselves and the Class pursuant to the Consumers Legal Remedies Act (the "CLRA").

148.    The CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer … [,]" Cal. Civ. Code § 1770, and that "[a]ny consumer who suffers any damage as a result of the use or employment by any person of a method, act, or practice declared to be unlawful by Section 1770 may bring an action against such person to recover or obtain," various forms of relief, including an injunction and damages, Cal. Civ. Code § 1780.

149.    Defendants are "[p]erson[s]" as defined by Cal. Civ. Code § 1761(c).

150.    The Class Vehicles are "[g]oods" as defined by Cal. Civ. Code § 1761(a).

151.    Plaintiffs and the Class Members are "[c]onsumer[s]" as defined by Cal. Civ. Code § 1761(d).

152.    This cause of action seeks injunctive relief at this time.  On January 14, 2020, prior to the filing of this Complaint, Plaintiffs sent Defendants a CLRA notice letter providing the notice required by California Civil Code § 1782(a).  Plaintiff sent the letter via certified mail, return receipt requested, to Defendants' designated agent for service of process located in Los Angeles, California, advising Defendants that it is in violation of the CLRA and must correct, replace or otherwise rectify the goods and/or services alleged to be in violation of §1770.  Defendant was further advised that in the event the relief requested has not been provided within thirty (30) days, Plaintiffs will amend their Complaint to include a request for monetary damages pursuant to the

34

CLASS ACTION COMPLAINT

CLRA.  A true and correct copy of Plaintiffs' letter is attached hereto as **Exhibit B**.  If Defendant does not correct, replace, or otherwise rectify the goods and/or services alleged in either Plaintiffs' letter or this Complaint within the statutorily proscribed 30-day period, Plaintiffs will amend their Complaint to seek both injunctive relief and monetary damages against Defendant pursuant to the CLRA, California Civil Code §§ 1781 and 1782.

153.    At all times herein mentioned, Plaintiffs were deceived by Defendants' unfair or deceptive acts as described more fully above, which included PROGRESSIVE CASUALTY INSURANCE COMPANY and PROGRESSIVE SELECT INSURANCE COMPANY making false, misleading and knowing, or in the exercise of good faith reasonably should have known that Plaintiff was legally entitled to recover the benefits under the aforementioned insurance policy, and the Progressive was obligated to provide Plaintiff with benefits under the insurance policy.

154.    Defendants' actions, misrepresentations and omissions of material facts relating to their misrepresentation of comparable vehicles' value, submitting false dealer reports, and refusing to consider comparable vehicles by the insureds, have violated, and continue to violate the CLRA, because those actions or omissions were intended to result, and which did result, a tangible burden to each consumer/insured and increased the cost of the Class Vehicles for each insured. The consumer/insured faced a choice of either settling quickly for a low-ball offer or to go through a long drawn out fight, where the Progressive Defendants clearly had the upper hand.

155.    Defendants' conduct, as hereinabove described, is in violation of Cal. Civ. Code § 1770 on the following grounds:

    a)  (a)(2): "[m]isrepresenting the … approval[] or certification of goods …";

    b)  (a)(4): "[u]sing deceptive representations or designations of geographic origin in connection with goods or services…";

    c)  (a)(5): "[r]epresenting that goods … have … approval, characteristics, … uses, [or] benefits … that they do not have …";

d) (a)(6): "[r]epresenting that goods are original or new if they have deteriorated unreasonably or are altered, reconditioned, reclaimed, used, or secondhand…";

e) (a)(7): "[r]epresenting that goods … are of a particular standard, quality, or grade, … if they are of another.";

f) (a)(9): "[a]dvertising goods … with intent not to sell them as advertised.";

g) (a)(10):"[a]dvertising goods or services with intent not to supply reasonably expectable demand, unless the advertisement discloses a limitation of quantity…";

h) (a)(13): "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of, price reductions…";

i) (a)(15):"[r]epresenting that a part, replacement, or repair service is needed when it is not…"; and

j) (a)(16): "[r]epresenting that the subject of a transaction has been supplied in accordance with a previous representation when it has not."

156.   Accordingly, Defendants' conduct constitutes unfair methods of competition and unfair or fraudulent acts or practices because The Progressive Defendants intentionally, maliciously, and oppressively conducted themselves willfully and wrongfully and made material misrepresentations about the condition of comparable vehicles to every one of its insured. Defendants knew, or should have known, that their representations were deceptive, false and misleading in light of their knowledge of Mitchell's misleading reports which deflated their insureds' "comparable vehicles."

157.   Defendants had a duty to disclose the inaccuracy of Mitchell's valuation reports because Defendants had exclusive knowledge that the "comparable vehicles" that were used deflated the insureds' loss vehicle valuation prior offering its insureds Settlement Offers for the Class Vehicles but failed to do so.

158.    Specifically, Defendants were under a duty to Plaintiffs and Class Members to disclose the deflation of the "comparable vehicles" in Mitchell's valuation reports because:

    a)    Defendants were in a superior position to know the true state of facts about the "comparable cars" used in Mitchell's valuation reports.  Plaintiffs are informed and believe, and based thereon allege, that Defendants knew about the deflation of the "comparable vehicles" through sources not available to consumers.

    b)    Plaintiffs and the Class Members could not reasonably have been expected to learn or discover the fabrication and deflation value vehicle of the "comparable vehicles" fabricated and deflated value vehicle of the Class Vehicles and unreasonably failing to pay Plaintiff's claim for benefits under the total loss vehicle provisions of his policy under the policy.

    c)    Defendants knew that Plaintiffs and the Class Members could not reasonably have been expected to learn or discover the fabricated and deflated value vehicle of the "comparable vehicles."

159.    In failing to disclose the fabricated and deflated value vehicle of the Class Vehicles and unreasonably failing to pay Plaintiff's claim for benefits under the total loss vehicle provisions of his policy under the policy, Defendants have knowingly and intentionally concealed material facts and breached their duty not to do so.

160.    The facts concealed or not disclosed by Defendants to Plaintiffs and Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to accept Progressive's settlement value or negotiate a higher price.  Had Plaintiffs and Class Members known about the fabricated and deflated vehicle value, they would not accepted Progressive's Settlement Offer, or they would have requested more.

161.    Had Plaintiffs and the Class Member known that The Progressive Defendants would fail to pay Plaintiff's claim for benefits under the total loss vehicle

provisions of his policy under the policy, they would have not procured their Policy with Progressive.

162.    The Progressive Defendants relied on Mitchell's misleading and deceptive reports knowing they would be distributed to The Progressive Defendants' insureds for use in determining the actual cash value.

163.    As a proximate result of the Progressive Defendants wrongful conduct, as aforementioned, Plaintiff has been denied the reasonable value for his total loss vehicle, had incurred reasonable rental car costs for the delay in resolution of the matter.

164.    The Progressive Defendants actions in wrongfully reducing the value of total loss vehicles, as aforementioned herein, constituted a pattern and practice of Progressive, which is designed to wrongfully withhold payment of claims with the intent of ignoring the interest of their insured.

165.    As a result, the Plaintiffs and Class Members have suffered irreparable harm.  The Plaintiffs and the other Class Members' injuries were proximately caused by Defendant's conduct as alleged herein.  Plaintiffs, individually and on behalf of all other Class Members, seek entry of an order enjoining Defendant from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to California Civil Code section 1780(a)(2), awarding exemplary and punitive damages against Defendants pursuant to California Civil Code sections 1780(a)(1) and (a)(4), and ordering the payment of costs and attorneys' fees, and such other relief as deemed appropriate and proper by the Court under California Civil Code section 1780(a)(2).  If Defendant is not restrained from engaging in these practices in the future, the Plaintiffs and the Class Members will continue to suffer harm.

166.    Pursuant to section 1780(d) of the CLRA, attached hereto as **Exhibit C** is an affidavit from Plaintiff showing that this action has been commenced in the proper forum.

/ / /

/ / /

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on behalf of themselves Class Members, respectfully request this Court:

(1)     An order certifying the proposed Class, designating Plaintiffs as named representatives of the Class, and designating the undersigned as Class Counsel;

(2)     A declaration that PROGRESSIVE is financially responsible for notifying all Class Members about the erroneous valuation reports;

(3)     An order enjoining PROGRRESSIVE from further deceptive practices of using low-value salvage vehicles to undervalue payments to insureds whose cars have been declared a total loss;

(4)     An award to Plaintiffs and Class Members for compensatory, exemplary, and statutory damages, including interest, in an amount to be proven at trial;

(5)     A declaration that PROGRESSIVE must disgorge, for the benefit of the Class, all or part of the ill-gotten profits it received from its deceptive practices, or make full restitution to Plaintiffs and Class Members;

(6)     An award of attorneys' fees and costs, as allowed by law, including but not limited to California Code of Civil Procedure § 1021.5;

(7)     An award of exemplary and punitive damages pursuant to Cal. Civ. Code § 1780 to prevent and deter Defendants from future unlawful conduct;

(8)     An award of damages for breach of express and implied warranties to Class Members;

(9)     Any equitable remedies available pursuant to Cal. Civ. Code § 1780 and other applicable law;

(10)    An award of pre-judgment and post-judgment interest, as provided by law;

(11)    Leave to amend the Complaint to conform to the evidence produced at

39

CLASS ACTION COMPLAINT

1    trial, and

2    (12)    That Plaintiffs and the Class Members be awarded any other relief as this

3            Court deems proper.

4

5

6    DATED: January 14, 2020              **KABATECK LLP**

7

8    By: _____
        Brian S. Kabateck

9      Christopher B. Noyes
       Katherine A. Bruce

10     Stephanie E. Charlin
       *Attorneys for Plaintiff Tasha Stack and*

11     *others similarly situated*

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CLASS ACTION COMPLAINT

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury for herself and members of the Class on all claims so triable.

DATED: January 14, 2020                                    **KABATECK LLP**

By: _____
Brian S. Kabateck
Christopher B. Noyes
Katherine A. Bruce
Stephanie E. Charlin

*Attorneys for Plaintiff Tasha Stack and   others similarly situated*

41

# EXHIBIT A

PO Box 31260
Tampa, FL 33631-3260



Tasha M Stack
143 Belcrest Ave
Daly City CA. 94015

**9611D CA 09/16, Auto**

9611D CA 0916





# CALIFORNIA
## AUTO POLICY



Form 9611D CA (09/16)
version 2.0

9611D CA 0916





We reserve the right to compromise or settle the deductible and property damage claims against the responsible parties for less than the full amount. We also reserve the right to incur reasonable expenses and attorney fees in pursuit of the recovery.

If the total recovery is less than the total of **our** payment and the deductible, **we** will reduce reimbursement of the deductible based on the proportion that the actual recovery bears to the total of **our** payment and the deductible. A proportionate share of collection expenses and attorney fees incurred in connection with these recovery efforts will also reduce reimbursement of the deductible.

These provisions will be applied in accordance with state law.

### JOINT AND INDIVIDUAL INTERESTS

If there is more than one named insured on this policy, any named insured may cancel or change this policy. The action of one named insured will be binding on all persons provided coverage under this policy.

### BANKRUPTCY

The bankruptcy or insolvency of an insured person will not relieve **us** of any obligations under this policy. If execution of a judgment against an insured person is returned unsatisfied because of the bankruptcy or insolvency of an insured person, a person claiming damages under Part I—Liability To Others may maintain an action against **us** for the amount of the judgment, subject to the terms and conditions of this policy and not exceeding **our** Limits of Liability under Part I.

## CONTENTS

**LIMITS OF FUTURE COVERAGE** ................................................ 1

**INSURING AGREEMENT** ........................................................ 1

**GENERAL DEFINITIONS** ....................................................... 1

**PART I—LIABILITY TO OTHERS**
Insuring Agreement ...........................................................3
Additional Definitions .......................................................4
Additional Payments .........................................................4
Exclusions ...................................................................4
Limits of Liability ..........................................................6
Financial Responsibility Laws ................................................7
Other Insurance ..............................................................7
Out-of-State Coverage ........................................................7

**PART II—MEDICAL PAYMENTS COVERAGE**
Insuring Agreement ...........................................................7
Additional Definitions .......................................................8
Exclusions ...................................................................8
Limits of Liability ..........................................................9
Unreasonable or Unnecessary Medical Expenses ................................10
Other Insurance .............................................................10

**PART III(A)—UNINSURED/UNDERINSURED MOTORIST BODILY INJURY COVERAGE**
Insuring Agreement ..........................................................10
Additional Definitions ......................................................11
Exclusions ..................................................................12
Limits of Liability .........................................................13
Other Insurance .............................................................14
Arbitration .................................................................14

**PART III(B)—UNINSURED MOTORIST PROPERTY DAMAGE COVERAGE**
Insuring Agreement—Uninsured Motorist Property Damage Coverage ....15
Insuring Agreement—Uninsured Motorist Collision
   Deductible Waiver Coverage ...............................................15
Additional Definitions ......................................................15
Exclusions ..................................................................16
Limits of Liability .........................................................16
Other Insurance .............................................................17
Arbitration .................................................................17

## PART IV—DAMAGE TO A VEHICLE

Insuring Agreement—Collision Coverage .................................................18
Insuring Agreement—Comprehensive Coverage .......................................18
Insuring Agreement—Additional Custom Parts or
   Equipment Coverage .........................................................................19
Insuring Agreement—Rental Reimbursement Coverage............................19
Insuring Agreement—Loan/Lease Payoff Coverage .................................20
Insuring Agreement—Pet Injury Coverage ..............................................20
Additional Definitions...........................................................................21
Exclusions ...........................................................................................21
Limits of Liability..................................................................................23
Payment of Loss...................................................................................24
No Benefit to Bailee .............................................................................24
Loss Payable Clause.............................................................................25
Other Sources of Recovery ...................................................................25
Appraisal ............................................................................................25

## PART V—ROADSIDE ASSISTANCE COVERAGE

Insuring Agreement ..............................................................................26
Additional Definitions............................................................................26
Exclusions ...........................................................................................26
Unauthorized Service Provider...............................................................27
Other Insurance ...................................................................................27

## PART VI—DUTIES IN CASE OF AN ACCIDENT OR LOSS ...........................27

## PART VII—GENERAL PROVISIONS

Policy Period and Territory......................................................................28
Changes...............................................................................................28
Duty to Report Changes .........................................................................29
Settlement of Claims .............................................................................29
Terms of Policy Conformed to Statutes ...................................................29
Transfer of Interest ...............................................................................30
Fraud or Misrepresentation ...................................................................30
Payment of Premium and Fees ...............................................................30
Cancellation .........................................................................................31
Cancellation Refund...............................................................................31
Nonrenewal ..........................................................................................32
Automatic Termination...........................................................................32
Legal Action Against Us..........................................................................32
Our Rights to Recover Payment...............................................................33
Joint and Individual Interests..................................................................34
Bankruptcy ...........................................................................................34

**We** may not be sued for payment under Part III(A)—Uninsured/Underinsured Motorist Bodily Injury Coverage or Part III(B)—Uninsured Motorist Property Damage Coverage unless within two years from the date of the accident an insured person or his or her legal representative has:

1. filed suit for **bodily injury** against the uninsured motorist in a court of competent jurisdiction and notice of such suit has been given to **us**;
2. reached an agreement with **us** as to the amount due under this coverage; or
3. formally instituted arbitration proceedings by notifying **us** in writing via certified mail, return receipt requested.

If **we** retain salvage, **we** have no duty to preserve or otherwise retain the salvage for any purpose, including evidence for any civil or criminal proceeding.

## OUR RIGHTS TO RECOVER PAYMENT

**We** are entitled to payment, reimbursement and subrogation as provided in this section regardless of whether the total amount of the recovery of the insured person on account of the injury is less than the actual loss suffered by the insured person. Such rights of recovery apply to the extent of **our** payment. The insured person assigns and transfers to **us** all rights, claims, demands and interest which that insured person may have against any party through the occurrence of a loss and authorizes us to sue, compromise or settle in the insured person's name all such claims and to execute and sign releases and acquittances in the insured person's name. That insured person may be required to sign documents related to the recovery and must do whatever else **we** require to help **us** exercise those recovery rights, and do nothing after an accident or loss to prejudice those rights. However, this paragraph does not apply to a payment made under Part III(A)—Uninsured/Underinsured Motorist Bodily Injury Coverage for damages that an insured person is entitled to recover from the owner or operator of an underinsured motor vehicle.

Subject to the terms of the preceding paragraph, when an insured person has been paid by **us** and also recovers from another, the amount recovered will be held by the insured person in trust for **us** and reimbursed to **us** to the extent of **our** payment. If **we** are not reimbursed, **we** may pursue recovery of that amount directly against that insured person.

If an insured person recovers from another, other than the owner or operator of an underinsured motor vehicle, without **our** written consent, the insured person's right to payment under any affected coverage will no longer exist.

If **we** elect to exercise **our** rights of recovery against another, **we** will also attempt to recover any deductible incurred by an insured person under this policy unless **we** are specifically instructed by that person not to pursue the deductible. **We** have no obligation to pursue recovery against another for any loss not covered by this policy.

## NONRENEWAL

If neither **we** nor one of **our** affiliates offers to renew or continue this policy, **we** will mail notice of nonrenewal to the named insured shown on the **declarations page** at the last known address appearing in **our** records. Proof of mailing will be sufficient proof of notice. Notice will be mailed at least 30 days before the end of the policy period. If **we** fail to mail or deliver an offer of renewal or a notice of nonrenewal to **you**, **your** policy will remain in effect for 30 days from the date that either the offer to renew or the notice of nonrenewal is subsequently mailed or delivered to **you**.

**We** may nonrenew for one or more of the following reasons:
1.  nonpayment of premium;
2.  fraud or material misrepresentation affecting the policy or an insured; or
3.  a substantial increase in the hazard insured against.

## AUTOMATIC TERMINATION

**1.  Coverage under this policy will terminate automatically if you do not accept our renewal offer.**

If **we** or an affiliate offers to renew or continue this policy and **you** or **your** representative does not accept, this policy will automatically terminate at the end of the current policy period. Failure to pay the required renewal or continuation premium when due will mean that **you** have not accepted **our** offer.

**2.  Coverage under this policy will terminate automatically when you obtain other insurance on a covered auto.**

If **you** obtain other insurance on a **covered auto**, any similar insurance displayed on the **declarations page** of this policy will terminate as to that **covered auto** on the effective date of the other insurance.

If a **covered auto** is sold or transferred to someone other than **you** or a **relative**, any insurance provided by this policy will terminate as to that **covered auto** on the effective date of the sale or transfer.

## LEGAL ACTION AGAINST US

**We** may not be sued unless there is full compliance with all the terms of this policy.

**We** may not be sued for payment under Part I—Liability To Others until the obligation of an insured person under Part I to pay is finally determined either by judgment after trial against that insured person or by written agreement of the insured person, the claimant, and **us**. No one will have any right to make **us** a party to a lawsuit to determine the liability of an insured person.

## CALIFORNIA AUTO POLICY

## LIMITS OF FUTURE COVERAGE

**PLEASE REFER TO THE "GENERAL PROVISIONS" SECTION OF THIS POLICY AND READ THE FOLLOWING PROVISIONS CAREFULLY. THEY MAY AFFECT YOUR COVERAGE IN THE FUTURE:**
**CHANGES**
**CANCELLATION**
**NONRENEWAL**

## INSURING AGREEMENT

In return for **your** payment of the premium, **we** agree to insure **you** subject to all the terms, conditions and limitations of this policy. **We** will insure **you** for the coverages and the limits of liability shown on this policy's **declarations page**. **Your** policy consists of the policy contract, **your** insurance application, the **declarations page**, and all endorsements to this policy.

## GENERAL DEFINITIONS

The following definitions apply throughout the policy. Defined terms are printed in bold-face type and have the same meaning whether in the singular, plural, or any other form.
1.  "**Additional auto**" means an **auto you** become the owner of during the policy period that does not permanently replace an **auto** expressly identified on the **declarations page** if:
    a.  **we** insure all other **autos you** own;
    b.  the **additional auto** is not covered by any other insurance policy;
    c.  **you** notify **us** within 30 days of becoming the owner of the **additional auto**; and
    d.  **you** pay any additional premium due.
    An **additional auto** will have the broadest coverage **we** provide for any **auto** shown on the **declarations page**. If **you** ask **us** to insure an **additional auto** more than 30 days after **you** become the owner, any coverage **we** provide will begin at the time **you** request coverage.
2.  "**Auto**" means a land motor vehicle:
    a.  of the private passenger, pickup body, or cargo van type;
    b.  designed for operation principally upon public roads;
    c.  with at least four wheels; and
    d.  with a gross vehicle weight rating of 12,000 pounds or less, according to the manufacturer's specifications.
    However, "**auto**" does not include step-vans, parcel delivery vans, or cargo cutaway vans or other vans with cabs separate from the cargo area.
3.  "**Auto business**" means the business of selling, leasing, repairing, parking, storing, servicing, delivering or testing vehicles.
4.  "**Bodily injury**" means bodily harm, sickness, or disease, including death that results from bodily harm, sickness, or disease.

5. "**Covered auto**" means:
   a. an **auto** or **trailer** expressly identified by make, model and vehicle identification number on the **declarations page** for the coverages applicable to that **auto** or **trailer**;
   b. any **additional auto**;
   c. any **replacement auto**; or
   d. a **trailer** owned by **you**.

6. "**Declarations page**" means the document showing **your** coverages, limits of liability, **covered autos**, premium, and other policy-related information. The **declarations page** may also be referred to as the Auto Insurance Coverage Summary.

7. "**Occupying**" means in, on, entering or exiting.

8. "**Personal vehicle sharing program**" means a legal entity qualified to do business in the state of California engaged in the business of facilitating the sharing of private passenger motor vehicles for noncommercial use by individuals within the state.

9. "**Rated resident**" means a person residing in the same household as **you** at the time of the loss who is not a **relative**, but only if that person is both:
   a. listed in the "Drivers and household residents" section on the **declarations page**; and
   b. not designated as either an "Excluded" or a "List Only" driver.

10. "**Relative**" means a person residing in the same household as **you**, and related to **you** by blood, marriage or adoption, and includes a ward, stepchild, or foster child. **Your** unmarried dependent children temporarily away from home will qualify as a **relative** if they intend to continue to reside in **your** household.

11. "**Replacement auto**" means an **auto** that permanently replaces an **auto** expressly identified on the **declarations page**. A **replacement auto** will have the same coverage as the **auto** it replaces if the **replacement auto** is not covered by any other insurance policy. However, if the **auto** being replaced had coverage under Part IV—Damage To A Vehicle, such coverage will apply to the **replacement auto** only during the first 30 days after **you** become the owner unless **you** notify **us** within that 30-day period that **you** want **us** to extend coverage beyond the initial 30 days. If the **auto** being replaced did not have coverage under Part IV—Damage To A Vehicle, such coverage may be added, but the **replacement auto** will have no coverage under Part IV until **you** notify **us** of the **replacement auto** and ask **us** to add the coverage.

12. "**Ride-sharing activity**" means the use of any vehicle to provide transportation of persons or property in connection with a **transportation network company** from the time a user logs on to, or signs in to, any online-enabled application, software, website or system until the time the user logs out of, or signs off of, any such online-enabled application, software, website or system, whether or not the user has accepted any passenger(s) or delivery assignment, including the time the user is on the way to pick up any passenger(s) or property, or is transporting any passenger(s) or property.

13. "**Trailer**" means a non-motorized trailer, including a farm wagon or farm implement, designed to be towed on public roads by an **auto** and not being used:
   a. for commercial purposes;

the financial institution. If the financial institution upon presentment does not honor the check, draft, electronic funds transfer, or similar form of remittance, this policy may, at **our** option, be deemed void from its inception. This means **we** will not be liable under this policy for any claims or damages that would otherwise be covered if the check, draft, electronic funds transfer, or similar form of remittance had been honored by the financial institution. Any action by **us** to present the remittance for payment more than once shall not affect **our** right to void this policy.

In addition to premium, fees may be charged on **your** policy. **We** may charge fees for installment payments, late payments, and other transactions. Payments made on **your** policy will be applied first to fees, then to premium due.

## CANCELLATION

**You** may cancel this policy during the policy period by calling or writing **us** and stating the future date **you** wish the cancellation to be effective.

**We** may cancel this policy during the policy period by mailing a notice of cancellation to the named insured shown on the **declarations page** at the last known address appearing in **our** records.

**We** will give at least 10 days notice of cancellation if the policy is cancelled for nonpayment of premium.

**We** will give at least 20 days notice of cancellation in all other cases.

**We** may cancel only for one or more of the following reasons:
1. nonpayment of premium;
2. fraud or material misrepresentation affecting the policy or an insured; or
3. a substantial increase in the hazard insured against.

Proof of mailing will be sufficient proof of notice. If this policy is cancelled, coverage will not be provided as of the effective date and time shown in the notice of cancellation. For purposes of cancellation, this policy is neither severable nor divisible. Any cancellation will be effective for all coverages for all persons and all vehicles.

## CANCELLATION REFUND

Upon cancellation, **you** may be entitled to a premium refund. However, **our** making or offering of a refund is not a condition of cancellation.

If this policy is cancelled, any refund due will be computed on a daily pro rata basis. However, **we** will retain a cancellation fee if this policy is cancelled at **your** request or if cancellation is for nonpayment of premium.

## TRANSFER OF INTEREST

The rights and duties under this policy may not be transferred to another person without **our** written consent. However, if a named insured shown on the **declarations page** dies, this policy will provide coverage until the end of the policy period for the legal representative of the named insured, while acting as such, and for persons covered under this policy on the date of the named insured's death.

## FRAUD OR MISREPRESENTATION

This policy was issued in reliance upon the information provided on **your** insurance application. **We** may void this policy at any time, including after the occurrence of an accident or loss, if **you**:

1. made incorrect statements or representations to **us** with regard to any material fact or circumstance;
2. concealed or misrepresented any material fact or circumstance; or
3. engaged in fraudulent conduct;

at the time of application. This means that **we** will not be liable for any claims or damages that would otherwise be covered. However, if **we** make a payment, the insured person must reimburse **us**.

Any changes **we** make at **your** request to this policy after inception will be made in reliance upon information **you** provide. If **you**:

1. make incorrect statements or representations to **us** with regard to any material fact or circumstance;
2. conceal or misrepresent any material fact or circumstance; or
3. engage in fraudulent conduct;

in connection with a requested change **we** may void the policy or reform it as it existed immediately prior to the requested change. **We** may do this at any time, including after the occurrence of an accident or loss. However, if **we** make a payment, the insured person must reimburse **us**.

When **we** have not voided or reformed the policy, **we** may still deny coverage for an accident or loss if **you**, in connection with the policy application, in connection with any requested change, or at any time during the policy period, have concealed or misrepresented any material fact or circumstance or engaged in fraudulent conduct and that concealment, misrepresentation, or fraudulent conduct was material to a risk **we** assumed.

**We** may deny coverage for an accident or loss if **you** or a person seeking coverage has concealed or misrepresented any material fact or circumstance, or engaged in fraudulent conduct, in connection with the presentation or settlement of a claim.

## PAYMENT OF PREMIUM AND FEES

If **your** initial premium payment is by check, draft, electronic funds transfer, or similar form of remittance, coverage under this policy is conditioned on payment to **us** by

b. as an office, store, or for display purposes; or
c. as a passenger conveyance.

14. "**Transportation network company**" means an organization, including, but not limited to, a corporation, limited liability company, partnership, sole proprietor, or any other entity operating in California that provides prearranged transportation services for compensation using an online-enabled application or platform to connect clients or passengers with drivers using a personal vehicle.

15. "**We**," "**us**" and "**our**" mean the underwriting company providing the insurance, as shown on the **declarations page**.

16. "**You**" and "**your**" mean:
    a. a person shown as a named insured on the **declarations page**;
    b. the spouse of a named insured if residing in the same household at the time of the loss; and
    c. the registered domestic partner of a named insured if residing in the same household at the time of the loss.

## PART I—LIABILITY TO OTHERS

### INSURING AGREEMENT

If **you** pay the premium for this coverage, **we** will pay damages for **bodily injury** and **property damage** for which an **insured person** becomes legally responsible because of an accident.

Damages include prejudgment interest awarded against an **insured person**.

**We** will settle or defend, at **our** option, any claim for damages covered by this Part I. If, however, in the defense of any claim, an **insured person** is entitled by law to independent counsel, and has not waived that right in writing, **we** will provide such counsel. Independent counsel may, however, be chosen by the **insured person** provided that such counsel has the following minimum qualifications:

1. at least five years of experience in civil litigation, including substantial defense experience in the subject at issue in the action; and
2. errors and omissions coverage.

**We** are not obligated to pay the fees of such counsel until the **insured person** provides **us** with reasonable written proof that the counsel chosen possesses these minimum qualifications. In no event are **we** obligated to pay fees in excess of the rate actually paid by **us** to an attorney in the ordinary course of business in the defense of a similar action in the community in which the claim arose or is being defended.

**We** will also pay for replacement of a child passenger restraint system meeting applicable federal motor vehicle safety standards that was damaged in, or being used by a child at the time of, an accident for which liability coverage under **your** policy is applicable due to the liability of an **insured person**.

## ADDITIONAL DEFINITIONS

When used in this Part I:
1. "**Insured person**" means:
   a. **you**, a **relative**, or a **rated resident** with respect to an accident arising out of the ownership, maintenance or use of an **auto** or a **trailer**;
   b. any person with respect to an accident arising out of that person's use of a **covered auto** with the permission of **you**, a **relative**, or a **rated resident**;
   c. any person or organization with respect only to vicarious liability for the acts or omissions of a person described in a. or b. above; and
   d. any "Additional Interest" shown on the **declarations page** with respect only to its liability for the acts or omissions of a person described in a. or b. above.
2. "**Property damage**" means physical damage to, destruction of, or loss of use of, tangible property.

## ADDITIONAL PAYMENTS

In addition to **our** limit of liability, **we** will pay for an **insured person**:
1. all expenses **we** incur in the settlement of any claim or defense of any lawsuit;
2. interest accruing after entry of judgment, until **we** have paid, offered to pay, or deposited in court, that portion of the judgment which does not exceed **our** limit of liability. This does not apply if **we** have not been given notice of suit or the opportunity to defend an **insured person**;
3. the premium on any appeal bond or attachment bond required in any lawsuit **we** defend. **We** have no duty to purchase a bond in an amount exceeding **our** limit of liability, and **we** have no duty to apply for or furnish these bonds;
4. up to $250 for a bail bond required because of an accident resulting in **bodily injury** or **property damage** covered under this Part I. **We** have no duty to apply for or furnish this bond; and
5. reasonable expenses, including loss of earnings up to $200 per day, incurred at **our** request.

## EXCLUSIONS—READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS PART I.

Coverage under this Part I, including **our** duty to defend, will not apply to any **insured person** for:
1. **bodily injury** or **property damage** arising out of the ownership, maintenance or use of any vehicle or trailer while being used:
   a. to carry persons or property for compensation or a fee;
   b. for retail or wholesale delivery, including, but not limited to, the pickup, transport or delivery of magazines, newspapers, mail or food; or
   c. for **ride-sharing activity**.
   This exclusion does not apply to shared-expense car pools;
2. any liability assumed under any contract by that **insured person**;
3. **bodily injury** to an employee of that **insured person** arising out of or within the course of employment. This exclusion does not apply to domestic employees if

In addition, **we** may increase the premium for this policy based on:
1. accident involvement by an insured person, and whether the insured person is at fault in the accident;
2. convictions for violating any provision of the Vehicle Code or the Penal Code relating to the operation of a motor vehicle;
3. the payment **we** make due to a claim filed on this policy; or
4. any other reason not otherwise specified in this Changes provision that is both lawful and not unfairly discriminatory.

The coverage provided in **your** policy may be changed only by the issuance of a new policy or an endorsement by **us**. However, if during the policy period **we** broaden any coverage afforded under the current edition of **your** policy without additional premium charge, that change will automatically apply to **your** policy as of the date the coverage change is implemented in **your** state.

If **you** ask **us** to delete a vehicle from this policy, no coverage will apply to that vehicle as of the date and time **you** ask **us** to delete it.

If there is unearned premium generated by an amendment or endorsement removing or reducing coverage for an insured person or property, it will first be applied to any balance owed on the policy as a whole.

## DUTY TO REPORT CHANGES

**You** must promptly report to **us** all changes, including additions and deletions, in policy information. This includes, but is not limited to, changes in:
1. **your** mailing address or **your** residence address;
2. the principal garaging address of any **covered auto**;
3. the residents in **your** household;
4. the persons of legal driving age residing in **your** household;
5. the persons who regularly operate a **covered auto**;
6. an operator's marital status; or
7. the driver's license or operator's permit status of **you**, a **relative**, or a **rated resident**.

## SETTLEMENT OF CLAIMS

**We** may use estimating, appraisal, or injury evaluation systems to assist **us** in adjusting claims under this policy and to assist **us** in determining the amount of damages, expenses, or loss payable under this policy. Such systems may be developed by **us** or a third party and may include computer software, databases, and specialized technology.

## TERMS OF POLICY CONFORMED TO STATUTES

If any provision of this policy fails to conform to the statutes of the state listed on **your** application as **your** residence, the provision shall be deemed amended to conform to such statutes. All other provisions shall be given full force and effect. Any disputes as to the coverages provided or the provisions of this policy shall be governed by the law of the state listed on **your** application as **your** residence.

6. take reasonable steps after a loss to protect the **covered auto**, or any other vehicle for which coverage is sought, from further loss. **We** will pay reasonable expenses incurred in providing that protection. If failure to provide such protection results in further loss, any additional damages will not be covered under this policy;

7. allow **us** to have the damaged **covered auto**, or any other damaged vehicle for which coverage is sought, inspected and appraised before its repair or disposal;

8. submit to medical examinations at **our** expense by doctors **we** select as often as **we** may reasonably require; and

9. authorize **us** to obtain medical and other records.

## PART VII—GENERAL PROVISIONS

### POLICY PERIOD AND TERRITORY

This policy applies only to accidents and losses occurring during the policy period shown on the **declarations page** and that occur within a state, territory or possession of the United States of America, or a province or territory of Canada, or while a **covered auto** is being transported between their ports.

### CHANGES

This policy contract, **your** insurance application (which is made a part of this policy as if attached hereto), the **declarations page**, and all endorsements to this policy issued by **us**, contain all the agreements between **you** and **us**. Subject to the following, the terms of this policy may not be changed or waived except by an endorsement issued by **us**.

The premium for this policy is based on information **we** received from **you** and other sources. **You** agree to cooperate with **us** in determining if this information is correct and complete, and to promptly notify **us** if it changes during the policy period. If this information is determined by **us** to be incorrect, incomplete, or if it changes during the policy period, **you** agree that **we** may adjust **your** policy information and premium accordingly. Changes that may result in a premium increase or decrease are contained in **our** rates and rules. These include, but are not limited to, **you**, a **relative**, or a **rated resident** obtaining a driver's license or operator's permit, or changes in:

1. the number, type or use classification of **covered autos**. Commercial use is prohibited except to the extent allowed by rules **we** have filed with the California Department of Insurance;

2. the persons who regularly operate a **covered auto**;

3. the persons of legal driving age residing in **your** household;

4. the residents in **your** household;

5. an operator's marital status;

6. **your** mailing address and **your** residence address;

7. the principal garaging address of any **covered auto**;

8. coverage, deductibles, or limits of liability; or

9. rating territory or discount eligibility.

benefits are neither paid nor required to be provided under workers' compensation, disability benefits, or similar laws;

4. **bodily injury** or **property damage** arising out of an accident involving any vehicle while being maintained or used by a person while employed or engaged in any **auto business**. This exclusion does not apply to **you**, a **relative**, a **rated resident**, or an agent or employee of **you**, a **relative**, or a **rated resident**, when using a **covered auto**;

5. **bodily injury** or **property damage** resulting from, or sustained during practice or preparation for:
   a. any pre-arranged or organized racing, stunting, speed or demolition contest or activity; or
   b. any driving activity conducted on a permanent or temporary racetrack or race-course;

6. **bodily injury** or **property damage** due to a nuclear reaction or radiation;

7. **bodily injury** or **property damage** for which insurance:
   a. is afforded under a nuclear energy liability insurance contract; or
   b. would be afforded under a nuclear energy liability insurance contract but for its termination upon exhaustion of its limit of liability;

8. **bodily injury** or **property damage** caused by an intentional act of that **insured person**, or at the direction of that **insured person**, even if the actual injury or damage is different than that which was intended or expected;

9. **property damage** to any property owned by, rented to, being transported by, or in the charge of that **insured person**. This exclusion does not apply to a rented residence or a rented garage;

10. **bodily injury** to **you** or a **relative**;

11. **bodily injury** or **property damage** arising out of the ownership, maintenance or use of any vehicle owned by **you** or furnished or available for **your** regular use, other than a **covered auto** for which this coverage has been purchased;

12. **bodily injury** or **property damage** arising out of the ownership, maintenance or use of any vehicle owned by a **relative** or a **rated resident** or furnished or available for the regular use of a **relative** or a **rated resident**, other than a **covered auto** for which this coverage has been purchased. This exclusion does not apply to **your** maintenance or use of such vehicle;

13. **bodily injury** or **property damage** arising out of **your**, a **relative's**, or a **rated resident's** use of a vehicle, other than a **covered auto**, without the permission of the owner of the vehicle or the person in lawful possession of the vehicle;

14. punitive or exemplary damages;

15. **bodily injury** or **property damage** caused by, or reasonably expected to result from, a criminal act or omission of that **insured person**. This exclusion applies regardless of whether that **insured person** is actually charged with, or convicted of, a crime. For purposes of this exclusion, criminal acts or omissions do not include traffic violations;

16. **bodily injury** or **property damage** arising out of the use of a **covered auto** while used in connection with a **personal vehicle sharing program**. This exclusion does not apply to the operation of a **covered auto** by **you**, a **relative**, or a **rated resident**; or

17. **bodily injury** or **property damage** arising out of the use of a **covered auto** while leased or rented to others or given in exchange for any compensation.

## LIMITS OF LIABILITY

The limit of liability shown on the **declarations page** for liability coverage is the most **we** will pay regardless of the number of:
1. claims made;
2. **covered autos**;
3. **insured persons**;
4. lawsuits brought;
5. vehicles involved in the accident; or
6. premiums paid.

If **your declarations page** shows a split limit:
1. the amount shown for "each person" is the most **we** will pay for all damages due to **bodily injury** to one person resulting from any one accident;
2. subject to the "each person" limit, the amount shown for "each accident" is the most **we** will pay for all damages due to **bodily injury** sustained by two or more persons in any one accident; and
3. the amount shown for "property damage" is the most **we** will pay for the total of all **property damage** resulting from any one accident.

Except as otherwise provided by law, the "each person" limit of liability applies to the total of all claims made for **bodily injury** to a person and all claims of others derived from such **bodily injury**, including, but not limited to, emotional injury or mental anguish resulting from the **bodily injury** of another or from witnessing the **bodily injury** to another, loss of society, loss of companionship, loss of services, loss of consortium, and wrongful death.

If the **declarations page** shows that "combined single limit" or "CSL" applies, the amount shown is the most **we** will pay for the total of all damages resulting from any one accident. However, without changing this limit of liability, **we** will comply with any law that requires **us** to provide any separate limits.

No one is entitled to duplicate payments for the same elements of damages.

Any payment to a person under this Part I will be reduced by any payment to that person under Part III(A)—Uninsured/Underinsured Motorist Bodily Injury Coverage.

**We** will not pay under this Part I any expenses paid or payable under Part II—Medical Payments Coverage.

If multiple auto policies issued by **us** are in effect for **you**, **we** will pay no more than the highest limit of liability for this coverage available under any one policy.

13. disablement that results from an intentional or willful act or action by **you**, a **relative**, or the operator of a **covered disabled auto**;
14. any **covered auto** while being used in connection with **ride-sharing activity**;
15. any **covered auto** while being used in connection with a **personal vehicle sharing program**; or
16. a trailer.

## UNAUTHORIZED SERVICE PROVIDER

When service is rendered by a provider in the business of providing roadside assistance and towing services, other than one of **our** authorized service representatives, **we** will pay only reasonable charges, as determined by **us**, for:
1. towing of a **covered disabled auto** to the nearest qualified repair facility; and
2. labor on a **covered disabled auto** at the place of disablement; which is necessary due to a **covered emergency**.

## OTHER INSURANCE

Any coverage provided under this Part V for service rendered by an unauthorized service provider will be excess over any other collectible insurance or towing protection coverage.

## PART VI—DUTIES IN CASE OF AN ACCIDENT OR LOSS

For coverage to apply under this policy, **you** or the person seeking coverage must promptly report each accident or loss even if **you** or the person seeking coverage is not at fault. **You** or the person seeking coverage must provide **us** with all accident or loss information, including time, place, and how the accident or loss happened. **You** or the person seeking coverage must also obtain and provide **us** the names and addresses of all persons involved in the accident or loss, the names and addresses of any witnesses, and the license plate numbers of the vehicles involved.

If **you** or the person seeking coverage cannot identify the owner or operator of a vehicle involved in the accident, or if theft or vandalism has occurred, **you** or the person seeking coverage must notify the police within 24 hours or as soon as practicable.

A person seeking coverage must:
1. cooperate with **us** in any matter concerning a claim or lawsuit;
2. provide any written proof of loss **we** may reasonably require;
3. allow **us** to take signed and recorded statements, including sworn statements and examinations under oath, which **we** may conduct outside the presence of **you** or any other person seeking coverage, and answer all reasonable questions **we** may ask as often as **we** may reasonably require;
4. promptly call to notify **us** about any claim or lawsuit and send **us** any and all legal papers relating to the claim or suit;
5. attend hearings and trials as **we** require;

## PART V—ROADSIDE ASSISTANCE COVERAGE

### INSURING AGREEMENT

If **you** pay the premium for this coverage, **we** will pay for **our** authorized service representative to provide the following services when necessary due to a **covered emergency**:
1.  towing of a **covered disabled auto** to the nearest qualified repair facility; and
2.  labor on a **covered disabled auto** at the place of disablement.

If a **covered disabled auto** is towed to any place other than the nearest qualified repair facility, **you** will be responsible for any additional charges incurred.

### ADDITIONAL DEFINITIONS

When used in this Part V:
1.  "**Covered disabled auto**" means a **covered auto** for which this coverage has been purchased that sustains a **covered emergency**.
2.  "**Covered emergency**" means a disablement that is a result of:
    a.  mechanical or electrical breakdown;
    b.  battery failure;
    c.  insufficient supply of fuel, oil, water, or other fluid;
    d.  flat tire;
    e.  lock-out; or
    f.  entrapment in snow, mud, water or sand within 100 feet of a road or highway.

### EXCLUSIONS—READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS PART V.

Coverage under this Part V will not apply to:
1.  more than three **covered emergencies** for any single **covered auto** in a six-month period;
2.  the cost of purchasing parts, fluid, lubricants, fuel, or replacement keys, or the labor to make replacement keys;
3.  installation of products or material not related to the disablement;
4.  labor not related to the disablement;
5.  labor on a **covered disabled auto** for any time period in excess of 60 minutes per disablement;
6.  towing or storage related to impoundment, abandonment, illegal parking, or other violations of law;
7.  assistance with jacks, levelers, airbags or awnings;
8.  labor or repair work performed at a service station, garage, or repair shop;
9.  auto storage charges;
10. disablement that occurs on roads not regularly maintained, sand beaches, open fields, or areas designated as not passable due to construction, weather, or earth movement;
11. mounting or removing of snow tires or chains;
12. tire repair;

An **auto** and attached **trailer** are considered one **auto**. Therefore, the limits of liability will not be increased for an accident involving an **auto** that has an attached **trailer**.

### FINANCIAL RESPONSIBILITY LAWS

When **we** certify this policy as proof of financial responsibility, this policy will comply with the law to the extent required. The **insured person** must reimburse **us** if **we** make a payment that **we** would not have made if this policy was not certified as proof of financial responsibility.

### OTHER INSURANCE

If there is any other applicable liability insurance or bond, **we** will pay only **our** share of the damages. **Our** share is the proportion that **our** limit of liability bears to the total of all applicable limits. However, any insurance **we** provide for a vehicle or trailer, other than a **covered auto**, will be excess over any other collectible insurance, self-insurance, or bond.

### OUT-OF-STATE COVERAGE

If an accident to which this Part I applies occurs in any state, territory or possession of the United States of America or any province or territory of Canada, other than the one in which a **covered auto** is principally garaged, and the state, province, territory or possession has:
1.  a financial responsibility or similar law requiring limits of liability for **bodily injury** or **property damage** higher than the limits shown on the **declarations page**, this policy will provide the higher limits; or
2.  a compulsory insurance or similar law requiring a non-resident to maintain insurance whenever the non-resident uses an **auto** in that state, province, territory or possession, this policy will provide the greater of:
    a.  the required minimum amounts and types of coverage; or
    b.  the limits of liability under this policy.

### PART II—MEDICAL PAYMENTS COVERAGE

### INSURING AGREEMENT

If **you** pay the premium for this coverage, **we** will pay the reasonable expenses incurred for necessary **medical services** received within three years from the date of a **motor vehicle** accident because of **bodily injury**:
1.  sustained by an **insured person**; and
2.  caused by that **motor vehicle** accident.

**We**, or someone on **our** behalf, will determine:
1.  whether the expenses for **medical services** are reasonable; and
2.  whether the **medical services** are necessary.

## ADDITIONAL DEFINITIONS

When used in this Part II:
1. "**Insured person**" means:
   a. **you**, a **relative**, or a **rated resident**:
      (i) while **occupying** an **auto**; or
      (ii) when struck by a **motor vehicle** or a trailer while not **occupying** a self-propelled motorized vehicle; and
   b. any other person while **occupying** a **covered auto** with the permission of **you**, a **relative**, or a **rated resident**.
2. "**Medical services**" means medical, surgical, dental, x-ray, ambulance, hospital, professional nursing, and funeral services, and includes the cost of eyeglasses, hearing aids, pharmaceuticals, orthopedics, and prosthetic devices.
3. "**Motor vehicle**" means a land motor vehicle designed for use principally on public roads.

## EXCLUSIONS—READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EX-CLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS PART II.

Coverage under this Part II will not apply to **bodily injury**:
1. sustained by any person while **occupying** a **covered auto** while it is being used:
   a. to carry persons or property for compensation or a fee;
   b. for retail or wholesale delivery, including, but not limited to, the pickup, transport or delivery of magazines, newspapers, mail or food; or
   c. for **ride-sharing activity**.
   This exclusion does not apply to shared-expense car pools;
2. arising out of an accident involving a vehicle while being maintained or used by a person while employed or engaged in any **auto business**. This exclusion does not apply to **you**, a **relative**, a **rated resident**, or an agent or employee of **you**, a **relative**, or a **rated resident**, when using a **covered auto**;
3. to any person resulting from, or sustained during practice or preparation for:
   a. any pre-arranged or organized racing, stunting, speed or demolition contest or activity; or
   b. any driving activity conducted on a permanent or temporary racetrack or race-course;
4. due to a nuclear reaction or radiation;
5. for which insurance:
   a. is afforded under a nuclear energy liability insurance contract; or
   b. would be afforded under a nuclear energy liability insurance contract but for its termination upon exhaustion of its limit of liability;
6. for which the United States Government is liable under the Federal Tort Claims Act;
7. sustained by any person while **occupying** any vehicle or trailer while located for use as a residence or premises;
8. if workers' compensation benefits are available for the **bodily injury**;
9. sustained by any person while **occupying** or when struck by any vehicle owned by **you** or furnished or available for **your** regular use, other than a **covered auto** for which this coverage has been purchased;

## LOSS PAYABLE CLAUSE

Payment under this Part IV for a loss to a **covered auto** will be made according to **your** interest and the interest of any lienholder shown on the **declarations page** or designated by **you**. At **our** option, payment may be made to both jointly, or to either separately. However, if the **covered auto** is not a total loss, **we** may make payment to **you** and the repairer of the **auto**.

The lienholder's interest will not be protected:
1. where fraud, misrepresentation, material omission, or intentional damage resulting in a denial of coverage by **us** has been committed by or at the direction of **you** or any person seeking coverage; or
2. where the loss is otherwise not covered under the terms of this policy.
• If this policy is cancelled, nonrenewed or voided, the interest of any lienholder under this agreement will also terminate.

## OTHER SOURCES OF RECOVERY

If other sources of recovery also cover the loss, **we** will pay only **our** share of the loss. **Our** share is the proportion that **our** limit of liability bears to the total of all applicable limits. However, any insurance **we** provide for a **non-owned auto**, or **trailer** not shown on the **declarations page**, will be excess over any other collectible source of recovery including, but not limited to:
1. any coverage provided by the owner of the **non-owned auto** or **trailer**;
2. any other applicable physical damage insurance; and
3. any other source of recovery applicable to the loss.

## APPRAISAL

If **we** cannot agree with **you** on the amount of a loss, then **we** or **you** may demand an appraisal of the loss. Within 30 days of any demand for an appraisal, each party shall appoint a competent appraiser and shall notify the other party of that appraiser's identity. The appraisers will determine the amount of loss. If they fail to agree, the disagreement will be submitted to a qualified umpire chosen by the appraisers. If the two appraisers are unable to agree upon an umpire within 15 days, **we** or **you** may request that a judge of a court of record, in the county where **you** reside, select an umpire. The appraisers and umpire will determine the amount of loss. The amount of loss agreed to by both appraisers, or by one appraiser and the umpire, will be binding. **You** will pay **your** appraiser's fees and expenses. **We** will pay **our** appraiser's fees and expenses. All other expenses of the appraisal, including payment of the umpire if one is selected, will be shared equally between **us** and **you**. Neither **we** nor **you** waive any rights under this policy by agreeing to an appraisal.

parts and materials necessary to repair or replace damage, deterioration, defects, or wear and tear on exterior body parts, windshields and other glass, wheels, and paint, that existed prior to the accident and that is eliminated as a result of the repair or replacement of property damaged in the loss.

   f.  To determine the amount necessary to repair or replace the damaged property as referred to in subsection 1., an adjustment may be made for betterment or depreciation and physical condition on:
     (i)  batteries;
     (ii)  tires;
     (iii)  engines and transmissions, if the engine has greater than 80,000 miles; and
     (iv)  any other **mechanical parts** that are nonfunctioning or inoperative. **We** will not make an adjustment for the labor costs associated with the replacement or repair of these parts.

   g.  The actual cash value is determined by the market value, age, and condition of the vehicle at the time the loss occurs.

   h.  Any amount paid or payable to a person under this Part IV shall be reduced by any amount paid for **property damage** under Part III(B)—Uninsured Motorist Property Damage Coverage.

3.  No deductible will apply to a loss to window glass when the glass is repaired instead of replaced.

4.  Duplicate recovery for the same elements of damages is not permitted.

5.  The following additional limits of liability apply to Pet Injury coverage:
   a.  The most **we** will pay for all damages in any one loss is a total of $1,000 regardless of the number of dogs or cats involved.
   b.  If **your pet** dies in, or as a direct result of, a covered loss, **we** will provide a death benefit of $1,000, less any payment **we** made toward veterinary expenses for **your pet**.
   c.  No deductible shall apply to this coverage.

## PAYMENT OF LOSS

**We** may, at **our** option:
1.  pay for the loss in money; or
2.  repair or replace the damaged or stolen property.

At **our** expense, **we** may return any recovered stolen property to **you** or to the address shown on the **declarations page**, with payment for any damage resulting from the theft. **We** may keep all or part of the property at the agreed or appraised value.

**We** may settle any loss with **you** or the owner or lienholder of the property.

## NO BENEFIT TO BAILEE

Coverage under this Part IV will not directly or indirectly benefit any carrier or other bailee for hire.

10.  sustained by any person while **occupying** or when struck by any vehicle owned by a **relative** or a **rated resident** or furnished or available for the regular use of a **relative** or a **rated resident**, other than a **covered auto** for which this coverage has been purchased. This exclusion does not apply to **you**;

11.  to **you**, a **relative**, or a **rated resident,** while **occupying** any vehicle, other than a **covered auto**, without the permission of the owner of the vehicle or the person in lawful possession of the vehicle;

12.  to any person while **occupying** a **covered auto** while leased or rented to others or given in exchange for any compensation, including while being used in connection with a **personal vehicle sharing program**. This exclusion does not apply to the operation of a **covered auto** by **you**, a **relative**, or a **rated resident**;

13.  caused directly or indirectly by:
   a.  war (declared or undeclared) or civil war;
   b.  warlike action by any military force of any government, sovereign or other authority using military personnel or agents. This includes any action taken to hinder or defend against an actual or expected attack; or
   c.  insurrection, rebellion, revolution, usurped power, or any action taken by a governmental authority to hinder or defend against any of these acts;

14.  caused directly or indirectly by:
   a.  any accidental or intentional discharge, dispersal or release of radioactive, nuclear, pathogenic or poisonous biological material; or
   b.  any intentional discharge, dispersal or release of chemical or hazardous material for any purpose other than its safe and useful purpose; or

15.  caused by, or reasonably expected to result from, a criminal act or omission of an **insured person**. This exclusion applies regardless of whether the **insured person** is actually charged with, or convicted of, a crime. For purposes of this exclusion, criminal acts or omissions do not include traffic violations.

## LIMITS OF LIABILITY

The limit of liability shown on the **declarations page** for Medical Payments Coverage is the most **we** will pay for each **insured person** injured in any one accident, regardless of the number of:
1.  claims made;
2.  **covered autos**;
3.  **insured persons**;
4.  lawsuits brought;
5.  vehicles involved in the accident; or
6.  premiums paid.

No one will be entitled to duplicate payments under this policy for the same elements of damages.

Any amount payable to an **insured person** under this Part II will be reduced by any amount paid or payable for the same expense under Part I—Liability To Others or Part III(A)—Uninsured/Underinsured Motorist Bodily Injury Coverage.

If multiple auto policies issued by **us** are in effect for **you**, **we** will pay no more than the highest limit of liability for this coverage available under any one policy.

## UNREASONABLE OR UNNECESSARY MEDICAL EXPENSES

If an **insured person** incurs expenses for **medical services** that **we** deem to be unreasonable or unnecessary, **we** may refuse to pay for those expenses and contest them.

If the medical service provider sues the **insured person** because **we** refuse to pay expenses for **medical services** that **we** deem to be unreasonable or unnecessary, **we** will pay any resulting defense costs, and any resulting judgment against the **insured person**, subject to the limit of liability for this coverage. **We** will choose the counsel. **We** will also pay reasonable expenses, including loss of earnings up to $200 per day, incurred at **our** request.

The **insured person** may not sue **us** for expenses for **medical services we** deem to be unreasonable or unnecessary unless the **insured person** paid the entire disputed amount to the medical service provider or the medical service provider has initiated collection activity against the **insured person** for the unreasonable or unnecessary expenses.

## OTHER INSURANCE

If there is other applicable **auto** medical payments insurance, **we** will pay only **our** share of the loss. **Our** share is the proportion that **our** limit of liability bears to the total of all applicable limits. However, any insurance **we** provide for an **insured person** occupy-ing a vehicle or trailer, other than a **covered auto**, will be excess over any other **auto** insurance providing payments for **medical services**.

### PART III(A)—UNINSURED/UNDERINSURED MOTORIST BODILY INJURY COVERAGE

## INSURING AGREEMENT

If **you** pay the premium for this coverage, **we** will pay for damages that an **insured person** is legally entitled to recover from the owner or operator of an **uninsured motor vehicle** or **underinsured motor vehicle** because of **bodily injury**:

1. sustained by an **insured person**;
2. caused by an accident; and
3. arising out of the ownership, maintenance or use of an **uninsured motor vehicle** or **underinsured motor vehicle**.

**We** will pay for damages an **insured person** is entitled to recover from the owner or operator of an **underinsured motor vehicle** only after the limits of liability under all applicable bodily injury liability bonds and policies have been exhausted by payment of judgments or settlements.

or the owner of the **non-owned auto** is actually charged with, or convicted of, a crime. For purposes of this exclusion, criminal acts or omissions do not include traf-fic violations.

## LIMITS OF LIABILITY

1. The limit of liability for loss to a **covered auto**, **non-owned auto**, or **custom parts or equipment** is the lowest of:
   a. the actual cash value of the stolen or damaged property at the time of the loss reduced by the applicable deductible;
   b. the amount necessary to replace the stolen or damaged property reduced by the applicable deductible;
   c. the amount necessary to repair the damaged property to its pre-loss condition reduced by the applicable deductible; or
   d. the Stated Amount shown on the **declarations page** for that **covered auto**.
   However, the most **we** will pay for loss to:
   a. **custom parts or equipment** is $1,000 unless **you** purchased Additional Custom Parts or Equipment Coverage ("ACPE"). If **you** purchased ACPE, the most **we** will pay is $1,000 plus the amount of ACPE **you** purchased.
   b. a **trailer** is the limit of liability shown on the **declarations page** for that **trailer**. If the **trailer** is not shown on the **declarations page**, the limit of liability is $500.
2. Payments for loss to a **covered auto**, **non-owned auto**, or **custom parts or equipment** are subject to the following provisions:
   a. If coverage applies to a **non-owned auto**, **we** will provide the broadest cover-age applicable to any **covered auto** shown on the **declarations page**.
   b. If **you** have elected a Stated Amount for a **covered auto**, the Stated Amount is the most **we** will pay for all loss to that **covered auto**, including its **custom parts or equipment**.
   c. Coverage for **custom parts or equipment** will not cause **our** limit of liability for loss to an **auto** under this Part IV to be increased to an amount in excess of the actual cash value of the **auto**, including its **custom parts or equipment**.
   d. In determining the amount necessary to repair damaged property to its pre-loss condition, the amount to be paid by **us**:
      (i) will not exceed the prevailing competitive labor rates charged in the area where the property is to be repaired and the cost of repair or replacement parts and equipment, as reasonably determined by **us**; and
      (ii) will be based on the cost of repair or replacement parts and equipment which may be new, reconditioned, remanufactured or used, including, but not limited to:
         (a) original manufacturer parts or equipment; and
         (b) nonoriginal manufacturer parts or equipment.
   e. To determine the amount necessary to repair or replace the damaged prop-erty as referred to in subsection 1., the total cost of necessary repair or replace-ment may be reduced by unrepaired prior damage. Unrepaired prior damage includes broken, cracked or missing parts; rust; dents; scrapes; gouges; and peeling paint. The reduction for unrepaired prior damage is the cost of labor,

b.  any driving activity conducted on a permanent or temporary racetrack or race-course;

4.  to any vehicle for which insurance:

a.  is afforded under a nuclear energy liability insurance contract; or

b.  would be afforded under a nuclear energy liability insurance contract but for its termination upon exhaustion of its limit of liability;

5.  to any vehicle caused by an intentional act committed by or at the direction of **you**, a **relative**, a **rated resident**, or the owner of a **non-owned auto**, even if the actual damage is different than that which was intended or expected;

6.  to a **covered auto** while it is leased or rented to others or given in exchange for compensation, including while being used in connection with a **personal vehicle sharing program**. This exclusion does not apply to the operation of a **covered auto** by **you**, a **relative**, or a **rated resident**;

7.  due to destruction or confiscation by governmental or civil authorities of any vehicle because **you**, any **relative**, or any **rated resident** engaged in illegal activities;

8.  to any vehicle that is due and confined to:

a.  wear and tear;

b.  freezing;

c.  mechanical, electrical or electronic breakdown or failure; or

d.  road damage to tires.

This exclusion does not apply if the damage results from the theft of a vehicle;

9.  to portable equipment, devices, accessories, and any other personal effects that are not permanently installed. This includes, but is not limited to:

a.  tapes, compact discs, cassettes, DVDs, and other recording or recorded media;

b.  any case or other container designed for use in storing or carrying tapes, compact discs, cassettes, DVDs, or other recording or recorded media;

c.  any device used for the detection or location of radar, laser, or other speed measuring equipment or its transmissions; and

d.  CB radios, telephones, two-way mobile radios, DVD players, personal computers, personal digital assistants, or televisions;

10. to any vehicle for diminution of value;

11. to any vehicle caused directly or indirectly by:

a.  war (declared or undeclared) or civil war;

b.  warlike action by any military force of any government, sovereign, or other authority using military personnel or agents. This includes any action taken to hinder or defend against an actual or expected attack; or

c.  insurrection, rebellion, revolution, usurped power, or any action taken by a governmental authority to hinder or defend against any of these acts;

12. to any vehicle caused directly or indirectly by:

a.  any accidental or intentional discharge, dispersal or release of radioactive, nuclear, pathogenic or poisonous biological material; or

b.  any intentional discharge, dispersal or release of chemical or hazardous material for any purpose other than its safe and useful purpose; or

13. to any vehicle caused by, or reasonably expected to result from, a criminal act or omission of **you**, a **relative**, a **rated resident**, or the owner of a **non-owned auto**. This exclusion applies regardless of whether **you**, the **relative**, the **rated resident**,

Any judgment or settlement for damages against an owner or operator of an **uninsured motor vehicle** that arises out of a lawsuit brought without **our** written consent is not binding on **us**.

## ADDITIONAL DEFINITIONS

When used in this Part III(A):

1.  "**Insured person**" means:

a.  **you**, a **relative**, or a **rated resident**;

b.  any person occupying a **covered auto**;

c.  any person **occupying** a non-owned **auto** while it is being operated by **you**; and

d.  any person who is entitled to recover damages covered by this Part III(A) because of **bodily injury** sustained by a person described in a., b. or c. above.

2.  "**Underinsured motor vehicle**" means a land motor vehicle or trailer to which a bodily injury liability bond, policy, cash deposit, or self-insurance certificate applies at the time of the accident, but the sum of all such bonds, policies, deposits or self-insurance is less than the coverage limit for Uninsured/Underinsured Motorist Coverage shown on the **declarations page**.

An "**underinsured motor vehicle**" does not include any vehicle or equipment:

a.  owned by **you**, a **relative**, or a **rated resident**. However, this does not apply if a vehicle owned by **you**, a **relative**, or a **rated resident** causes **bodily injury** to an **insured person** while being operated, or caused to be operated, by a person without the consent of the injured **insured person** and in connection with criminal activity, if that criminal activity is documented in a police report and the injured **insured person** is not a party to the criminal activity;

b.  owned by any governmental unit or agency;

c.  designed mainly for use off public roads, while not on public roads;

d.  while used as a residence or premises; or

e.  expressly identified by make, model and serial number on the **declarations page** of this policy;

3.  "**Uninsured motor vehicle**" means a land motor vehicle or trailer of any type:

a.  to which no bodily injury liability bond or policy applies at the time of the accident;

b.  to which a bodily injury liability bond or policy applies at the time of the accident, but the bonding or insuring company:

(i)   denies coverage;

(ii)  refuses to admit coverage except conditionally or under a reservation of rights; or

(iii) is insolvent, or becomes so within one year of the accident;

c.  that is a hit-and-run vehicle whose owner or operator cannot be identified and which causes **bodily injury** by striking:

(i)   **you**, a **relative**, or a **rated resident**; or

(ii)  a vehicle that an **insured person** is **occupying**;

provided that the **insured person**, or someone on his or her behalf:

(i)   reports the accident to the police or civil authority within 24 hours or as soon as practicable after the accident; and

(ii) provides **us**, within 30 days of the accident, a statement under oath that the **insured person**, or his or her legal representative, has a cause of action against the owner or operator of a vehicle who cannot be identified. The statement must set forth facts supporting the claim; or

d. that is used without the permission of the owner thereof if there is no bodily injury liability insurance or bond applicable at the time of the accident with respect to the owner or operator thereof.

An "**uninsured motor vehicle**" does not include any vehicle or equipment:

a. owned or operated by **you**, a **relative**, or a **rated resident**. However, this does not apply if a vehicle owned by **you**, a **relative**, or a **rated resident** causes **bodily injury** to an **insured person** while being operated, or caused to be operated, by a person without the consent of the injured **insured person** and in connection with criminal activity, if that criminal activity is documented in a police report and the injured **insured person** is not a party to the criminal activity;

b. owned or operated by a self-insurer under any applicable motor vehicle law, except a self-insurer that is or becomes insolvent;

c. owned by any governmental unit or agency;

d. designed mainly for use off public roads, while not on public roads;

e. while located for use as a residence or premises; or

f. that is a **covered auto** expressly identified by make, model and serial number on the **declarations page** of this policy.

## EXCLUSIONS—READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS PART III(A).

Coverage under this Part III(A) will not apply:

1. to **bodily injury** sustained by any person while using or **occupying**:
   a. any **auto** while being used:
      (i) to carry persons or property for compensation or a fee;
      (ii) for retail or wholesale delivery, including, but not limited to, the pickup, transport or delivery of magazines, newspapers, mail or food; or
      (iii) for **ride-sharing activity**.
      This exclusion does not apply to shared-expense car pools; or
   b. a motor vehicle that is owned by **you**, a **relative**, or a **rated resident**. This exclusion does not apply to a **covered auto** that is insured under this Part III(A);

2. to **bodily injury** sustained by **you**, a **relative**, or a **rated resident** while using any vehicle, other than a **covered auto**, without the permission of the owner of the vehicle or the person in lawful possession of the vehicle;

3. directly or indirectly to benefit any insurer or self-insurer under any of the following or similar laws:
   a. workers' compensation law; or
   b. disability benefits law;

4. to any punitive or exemplary damages;

5. to **bodily injury** sustained by any person and caused by an **uninsured motor**

**owned auto** at the time of a loss covered under Collision or Comprehensive coverage, **we** will provide:

1. up to $1,000 for reasonable and customary veterinary fees incurred by **you**, a **relative**, or a **rated resident** if **your pet** is injured in, or as a direct result of, the covered loss; or

2. a $1,000 death benefit if **your pet** dies in, or as a direct result of, the covered loss, less any payment **we** made toward veterinary expenses for **your pet**.

In the event of a covered loss due to the theft of a **covered auto** or **non-owned auto**, **we** will provide the death benefit provided **your pet** is inside that auto at the time of the theft and **your pet** is not recovered.

## ADDITIONAL DEFINITIONS

When used in this Part IV:

1. "**Collision**" means the upset of a vehicle or its impact with another vehicle or object.

2. "**Custom parts or equipment**" means equipment, devices, accessories, enhancements and changes, other than those that are offered by the manufacturer specifically for that **auto** model, or that are installed by the auto dealership as part of the original sale of a new **auto**, that:
   a. are permanently installed or attached; and
   b. alter the appearance or performance of the **auto**.

3. "**Mechanical parts**" means operational parts on a vehicle that wear out over time or have a finite useful life or duration typically shorter than the life of the vehicle as a whole. **Mechanical parts** do not include external crash parts, wheels, paint, or windshields and other glass.

4. "**Non-owned auto**" means an **auto** that is not owned by or furnished or available for the regular use of **you**, a **relative**, or a **rated resident** while in the custody of or being operated by **you**, a **relative**, or a **rated resident** with the permission of the owner of the **auto** or the person in lawful possession of the **auto**.

5. "**Your pet**" means any dog or cat owned by **you**, a **relative**, or a **rated resident**.

## EXCLUSIONS—READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS PART IV.

Coverage under this Part IV will not apply for loss:

1. to any vehicle while being used:
   a. to carry persons or property for compensation or a fee;
   b. for retail or wholesale delivery, including, but not limited to, the pickup, transport or delivery of magazines, newspapers, mail or food; or
   c. for **ride-sharing activity**.
   This exclusion does not apply to shared-expense car pools;

2. to a **non-owned auto** while being maintained or used by a person while employed or engaged in any **auto business**;

3. to any vehicle resulting from, or sustained during practice or preparation for:
   a. any pre-arranged or organized racing, stunting, speed or demolition contest or activity; or

If Rental Reimbursement Coverage applies, no other coverage under this policy for rental expenses will apply.

Rental charges will be reimbursed beginning:
1. when the **covered auto** cannot be driven due to a loss; or
2. if the **covered auto** can be driven, when **you** deliver the **covered auto** to an auto repair shop or one of **our** Service Centers for repairs due to the loss;
and ending the earliest of:
1. when the **covered auto** has been returned to **you**;
2. when the **covered auto** has been repaired;
3. when the **covered auto** has been replaced;
4. 72 hours after **we** make an offer to settle the loss if the **covered auto** is deemed by **us** to be a total loss; or
5. when **you** incur 30 days worth of rental charges.

**You** must provide **us** written proof of **your** rental charges to be reimbursed.

### INSURING AGREEMENT—LOAN/LEASE PAYOFF COVERAGE

If **you** pay the premium for this coverage, and the **covered auto** for which this coverage was purchased is deemed by **us** to be a total loss, **we** will pay, in addition to any amounts otherwise payable under this Part IV, the difference between:
1. the actual cash value of the **covered auto** at the time of the total loss; and
2. any greater amount the owner of the **covered auto** is legally obligated to pay under a written loan or lease agreement to which the **covered auto** is subject at the time of the total loss, reduced by:
   a. unpaid finance charges or refunds due to the owner for such charges;
   b. excess mileage charges or charges for wear and tear;
   c. charges for extended warranties or refunds due to the owner for extended warranties;
   d. charges for credit insurance or refunds due to the owner for credit insurance;
   e. past due payments and charges for past due payments; and
   f. collection or repossession expenses.

However, **our** payment under this coverage shall not exceed the limit of liability shown on the **declarations page**. The limit of liability is a percentage of the actual cash value of the **covered auto** at the time of the loss.

This coverage applies only if **you** have purchased both Comprehensive Coverage and Collision Coverage for that **covered auto** and the loss is covered under one of those coverages.

### INSURING AGREEMENT—PET INJURY COVERAGE

If **you** have purchased Collision coverage for at least one **covered auto** under **your** policy, and if **your pet** sustains injury or death while inside a **covered auto** or non-

**vehicle** if that person or the legal representative of that person settles without **our** written consent;
6. to **bodily injury** sustained by any person while using or **occupying** a motor vehicle operated by a person excluded from coverage under this policy under a Named Driver Exclusion Election;
7. to **bodily injury** sustained by any person while **occupying** a motor vehicle, other than a **covered auto**, if the owner has insurance similar to that provided under this Part III(A); or
8. to **bodily injury** arising out of the use of a **covered auto** while being used in connection with a **personal vehicle sharing program**. This exclusion does not apply to the operation of a **covered auto** by **you**, a **relative**, or a **rated resident**.

### LIMITS OF LIABILITY

The limit of liability shown on the **declarations page** for Uninsured/Underinsured Motorist Coverage is the most **we** will pay regardless of the number of:
1. claims made;
2. **covered autos**;
3. **insured persons**;
4. lawsuits brought;
5. vehicles involved in the accident; or
6. premiums paid.

If **your declarations page** shows a split limit:
1. the amount shown for "each person" is the most **we** will pay for all damages due to **bodily injury** to one person; and
2. subject to the "each person" limit, the amount shown for "each accident" is the most **we** will pay for all damages due to **bodily injury** sustained by two or more persons in any one accident.

The "each person" limit of liability includes the total of all claims made for **bodily injury** to an **insured person** and all claims of others derived from such **bodily injury**, including, but not limited to, emotional injury or mental anguish resulting from the **bodily injury** of another or from witnessing the **bodily injury** to another, loss of society, loss of companionship, loss of services, loss of consortium, and wrongful death.

If the **declarations page** shows that "combined single limit" or "CSL" applies, the amount shown is the most **we** will pay for the total of all damages resulting from any one accident. However, without changing this total limit of liability, **we** will comply with any law that requires **us** to provide any separate limits.

The limits of liability under this Part III(A) will be reduced by all sums:
1. paid because of **bodily injury** by or on behalf of any persons or organizations that may be legally responsible;
2. paid under Part I—Liability To Others; and
3. paid, and the present value of all amounts payable, because of **bodily injury** under any workers' compensation law.

The damages an **insured person** is entitled to recover under this Part III(A) shall be reduced by all sums paid or payable under any valid and collectible automobile medical payments insurance available to the **insured person** including, but not limited to, all sums paid or payable under this policy's Part II—Medical Payments Coverage.

No one will be entitled to duplicate payments for the same elements of damages.

If multiple auto policies issued by **us** are in effect for **you**, **we** will pay no more than the highest limit of liability for this coverage available under any one policy.

## OTHER INSURANCE

If there is other applicable uninsured or underinsured motorist coverage, the damages an **insured person** is entitled to recover under this Part III(A) shall be deemed not to exceed the highest limit of any applicable coverage. **We** will pay only **our** share of the damages. **Our** share is the proportion that **our** limit of liability bears to the total of all available coverage limits. However, any insurance **we** provide with respect to a vehicle that is not a **covered auto** will be excess over any other uninsured or underinsured motorist coverage.

## ARBITRATION

If **we** and an **insured person** cannot agree on:

1. the legal liability of the operator or owner of an **uninsured motor vehicle** or **underinsured motor vehicle**; or
2. the amount of the damages sustained by the **insured person**;

this will be determined by arbitration. If the accident involves an **uninsured motor vehicle**, any demand for arbitration must be made within two years of the date of the accident. If the accident involves an **underinsured motor vehicle**, the demand must be made after all applicable bodily injury liability bonds or policies have been exhausted by payment of judgments or settlements and prior to the expiration of the bodily injury statute of limitations in the state in which the accident occurred. An **insured person** demanding arbitration must send written notice to **us**, or **our** agent for process, by certified mail, return receipt requested.

In the event of arbitration, arbitration shall be conducted by a single neutral arbitrator. The costs and fees of the arbitrator will be shared equally.

Unless both parties agree otherwise, arbitration will take place in the county in which the **insured person** resides. Local rules of procedure and evidence will apply.

A decision by the arbitrator will be binding with respect to a determination of:

1. the legal liability of the operator or owner of an **uninsured motor vehicle** or **underinsured motor vehicle**; and
2. the amount of the damages sustained by the **insured person**.

The arbitrator will have no authority to award an amount in excess of the limit of liability.

In addition, this coverage will pay for replacement of a child passenger restraint system meeting applicable federal motor vehicle safety standards that was damaged in, or being used by a child at the time of, a sudden, direct and accidental loss to a **covered auto** or **non-owned auto** that is not caused by **collision** and to which loss this coverage applies.

Also, **we** will pay for:

1. reasonable transportation expenses incurred by **you** if a **covered auto** is stolen; and
2. loss of use damages that **you** are legally liable to pay if a **non-owned auto** is stolen. A combined maximum of $900, not exceeding $30 per day, will apply to these additional benefits. The additional benefit for transportation expenses will not apply if **you** purchased Rental Reimbursement Coverage for the stolen **covered auto**.

Coverage for transportation expenses and loss of use damages begins 48 hours after **you** report the theft to **us** and ends the earliest of:

1. when the **auto** has been recovered and returned to **you** or its owner;
2. when the **auto** has been recovered and repaired;
3. when the **auto** has been replaced; or
4. 72 hours after **we** make an offer to settle the loss if the **auto** is deemed by **us** to be a total loss.

**We** must receive written proof of transportation expenses and loss of use damages.

## INSURING AGREEMENT—ADDITIONAL CUSTOM PARTS OR EQUIPMENT COVERAGE

**We** will pay for sudden, direct and accidental loss to **custom parts or equipment** on a **covered auto** for which this coverage has been purchased. This coverage applies only if **you** have purchased both Comprehensive Coverage and Collision Coverage for that **covered auto** and the loss is covered under one of those coverages. This coverage applies in addition to any coverage automatically provided for **custom parts or equipment** under Comprehensive Coverage or Collision Coverage.

## INSURING AGREEMENT—RENTAL REIMBURSEMENT COVERAGE

**We** will reimburse rental charges incurred when **you** rent an **auto** from a rental agency or auto repair shop due to a loss to a **covered auto** for which Rental Reimbursement Coverage has been purchased. This coverage applies only if **you** have purchased both Comprehensive Coverage and Collision Coverage for that **covered auto** and the loss is covered under one of those coverages.

Additional fees or charges for insurance, damage waivers, optional equipment, fuel, or accessories are not covered.

This coverage is limited to the each day limit shown on the **declarations page** for a maximum of 30 days.

In the event of arbitration, arbitration shall be conducted by a single neutral arbitrator. The costs and fees of the arbitrator will be shared equally.

Unless both parties agree otherwise, arbitration will take place in the county in which the insured person resides. Local rules of procedure and evidence will apply.

A decision by the arbitrator will be binding with respect to a determination of:
1. the legal liability of the operator or owner of an **uninsured motor vehicle**; and
2. the amount of the **property damage** sustained by the **insured person**.
The arbitrator will have no authority to award an amount in excess of the limit of liability.

## PART IV—DAMAGE TO A VEHICLE

### INSURING AGREEMENT—COLLISION COVERAGE

If **you** pay the premium for this coverage, **we** will pay for sudden, direct and accidental loss to a:
1. **covered auto**, including an attached **trailer**; or
2. **non-owned auto**;
and its **custom parts or equipment**, resulting from **collision**.

In addition, this coverage will pay for replacement of a child passenger restraint system meeting applicable federal motor vehicle safety standards that was damaged in, or being used by a child in a **covered auto** or **non-owned auto** at the time of, a **collision** to which this coverage applies.

### INSURING AGREEMENT—COMPREHENSIVE COVERAGE

If **you** pay the premium for this coverage, **we** will pay for sudden, direct and accidental loss to a:
1. **covered auto**, including an attached **trailer**; or
2. **non-owned auto**;
and its **custom parts or equipment**, that is not caused by **collision**.

A loss not caused by **collision** includes:
1. contact with an animal (including a bird);
2. explosion or earthquake;
3. fire;
4. malicious mischief or vandalism;
5. missiles or falling objects;
6. riot or civil commotion;
7. theft or larceny;
8. windstorm, hail, water or flood; or
9. breakage of glass not caused by **collision**.

## PART III(B)—UNINSURED MOTORIST PROPERTY DAMAGE COVERAGE

### INSURING AGREEMENT—UNINSURED MOTORIST PROPERTY DAMAGE COVERAGE

If **you** pay the premium for this coverage, **we** will pay for **property damage** caused by the owner or operator of an **uninsured motor vehicle** that:
1. is caused by an accident; and
2. arises out of the ownership, maintenance or use of an **uninsured motor vehicle**.

### INSURING AGREEMENT—UNINSURED MOTORIST COLLISION DEDUCTIBLE WAIVER COVERAGE

If **you** pay both the premium for this coverage and the premium for Collision Coverage under Part IV—Damage To A Vehicle for the same **covered auto**, **we** will pay your Collision Coverage deductible for that **covered auto** if involved in an accident that:
1. is caused by the owner or operator of an **uninsured motor vehicle**; and
2. arises out of the ownership, maintenance, or use of an **uninsured motor vehicle**.

**We** will pay for replacement of a child passenger restraint system meeting applicable federal motor vehicle safety standards that was damaged in, or being used by a child in a **covered auto** at the time of, an accident for which Uninsured Motorist Property Damage Coverage applies due to the liability of the owner or operator of an **uninsured motor vehicle**.

The owner or operator of the **uninsured motor vehicle** must be identified or the **uninsured motor vehicle** must be identified by its license number. **You**, or someone on **your** behalf, must notify **us**, or one of **our** agents or brokers, of any accident resulting in **property damage** within 10 business days from the date of the accident.

Any judgment or settlement for damages against an owner or operator of an **uninsured motor vehicle** that arises out of a lawsuit brought without **our** written consent is not binding on **us**.

### ADDITIONAL DEFINITIONS

When used in this Part III(B):
1. "**Property damage**" means physical damage to, or destruction of, a **covered auto** caused by actual, direct physical contact with an **uninsured motor vehicle**. It does not include loss of use of the **covered auto**.
2. "**Uninsured motor vehicle**" means a land motor vehicle or trailer of any type:
    a. to which no **property damage** liability bond or policy applies at the time of the accident;
    b. to which a **property damage** liability bond or policy applies at the time of the accident, but the bonding or insuring company:
        (i) denies coverage;

(ii)  refuses to admit coverage except conditionally or under a reservation of rights; or

(iii)  is insolvent, or becomes so within one year of the accident; or

c.  that is used without the owner's permission if there is no property damage liability insurance or bond applicable at the time of the accident with respect to the owner or operator of the vehicle.

An "**uninsured motor vehicle**" does not include any vehicle or equipment:

a.  owned or operated by **you** or a **relative** or furnished or available for the regular use of **you** or a **relative**;

b.  owned or operated by a self-insurer under any applicable motor vehicle law, except a self-insurer that is or becomes insolvent;

c.  owned by any governmental unit or agency;

d.  operated on rails or crawler treads;

e.  designed mainly for use off public roads, while not on public roads;

f.  while located for use as a residence or premises;

g.  expressly identified by make, model and serial number on the **declarations page** of this policy; or

h.  that has at least the minimum property damage liability limits required by Vehicle Code § 16056, even if the property damage liability limits are not sufficient to compensate for all property damage caused by the owner or operator of the vehicle.

**EXCLUSIONS—READ THE FOLLOWING EXCLUSIONS CAREFULLY. IF AN EXCLUSION APPLIES, COVERAGE WILL NOT BE AFFORDED UNDER THIS PART III(B).**

Coverage under this Part III(B) will not apply:

1.  to any punitive or exemplary damages;

2.  to **property damage** to a motor vehicle operated by a person excluded from coverage under this policy under a Named Driver Exclusion Election;

3.  to **property damage** to a **trailer**;

4.  to **property damage** if there is no actual, direct physical contact between the **uninsured motor vehicle** and the **covered auto**;

5.  to **property damage** unless the owner or operator of the **uninsured motor vehicle**, or the license plate number of the **uninsured motor vehicle**, can be identified; or

6.  to **property damage** arising out of the use of a **covered auto** while being used in connection with a **personal vehicle sharing program**. This exclusion does not apply to the operation of a **covered auto** by **you**, a **relative**, or a **rated resident**.

**LIMITS OF LIABILITY**

The limit of liability shown on the **declarations page** for Uninsured Motorist Property Damage Coverage is the most **we** will pay regardless of the number of:

1.  claims made;

2.  **covered autos**;

3.  lawsuits brought;

4.  vehicles involved in the accident; or

5.  premiums paid.

The amount shown on the **declarations page** for "property damage" is the most **we** will pay for the aggregate of all **property damage** caused by any one accident.

**Our** Limit of Liability under this Part III(B) for **property damage** to a **covered auto** arising out of one accident is the lowest of:

1.  the actual cash value of the **covered auto** at the time of the accident;

2.  the amount necessary to replace the **covered auto**;

3.  the amount necessary to repair the **covered auto** to its pre-loss condition;

4.  any Limit of Liability shown on the **declarations page** for "property damage" under this Part III(B); or

5.  the amount of the deductible for Collision Coverage shown on the **declarations page**. This subpart only applies if **you** have paid the premium for Collision Coverage under Part IV—Damage To A Vehicle.

**Our** Limit of Liability for Uninsured Motorist Collision Deductible Waiver Coverage under this Part III(B) for **property damage** to a **covered auto** arising out of any one accident is the lower of:

1.  the amount of the loss; or

2.  the amount of the Collision Coverage deductible shown on the **declarations page** for the **covered auto** that is involved in the accident.

Payments for **property damage** under this Part III(B) are subject to an adjustment for depreciation and physical condition; such adjustment will be made in determining the Limit of Liability at the time of the accident.

No one will be entitled to duplicate payments for the same elements of damages.

**OTHER INSURANCE**

If there is other applicable uninsured motorist property damage coverage, **we** will pay only **our** share of the damages. **Our** share is the proportion that **our** limit of liability bears to the total of all available coverage limits.

**ARBITRATION**

If **we** and an **insured person** cannot agree on:

1.  the legal liability of the operator or owner of an **uninsured motor vehicle**; or

2.  the amount of the **property damage** sustained by the **insured person**;

this will be determined by arbitration. Any demand for arbitration must be made within one year from the date of the accident.

# EXHIBIT B



January 14, 2020

*VIA CERTIFIED MAIL*
*RETURN RECEIPT REQUESTED*

Progressive Casualty Insurance Co. &
Progressive Select Insurance Co.
c/o CT Corporation System
818 West Seventh Street, Suite 930
Los Angeles, CA 90017

RE:  *Tasha Stacks et al. v, Progressive Casualty Insurance Company et al.*
**NOTICE OF VIOLATIONS OF CALIFORNIA'S CONSUMERS LEGAL REMEDIES ACT AND DEMAND FOR RELIEF (Cal. Civ. Code § 1782)**

To Whom It May Concern:

We send this letter on behalf of our client Tasha Sacks ("Plaintiff"), and on behalf of a putative class of California citizens (the "Class Members") who are first party insureds of automobile insurance carrier Progressive Casualty Insurance Company and Progressive Select Insurance Company (collectively "the Progressive Defendants") who received undervalued compensation for their total loss vehicles from 2016 to the present. As set forth in more detail in the attached Complaint ("Complaint") and discussed in detail below, this letter is to advise you that Defendants violated and continue to violate the Consumers Legal Remedies Act ("CLRA"), Bus. & Prof. Code §§ 17200, *et seq*., by engaging in unfair or deceptive acts or practices when valuating and issuing payments for your insured's total loss vehicles. We hereby demand, pursuant to Cal. Civ. Code § 1782(a)(2), that you "correct, repair, replace, or otherwise rectify the goods [i.e., the Valuation and Payment for Total Loss of Vehicles] … alleged to be in violation of Section 1770" on a class wide basis within 30 days after receipt of this letter; otherwise Claimants will add a request for damages against Respondents under § 1780.

## I.    BASIS OF THE COMPLAINT

Plaintiff and putative class members ("Plaintiffs") are first party insureds of the Progressive Defendants. Plaintiffs submit claims to Progressive for reimbursement of their vehicles that are declared a "total loss" (vehicles where an election is made to forego any vehicle repair) following an accident. To determine the coverage payment to Plaintiff and putative class members, the Progressive Defendants engage third party service provider, Mitchel International, Inc. (hereinafter "Mitchell") to find valuations of "comparable



**Kabateck** LLP

vehicles." Defendant Mitchell generates a report for Plaintiffs with allegedly "comparable" vehicle pricings to choose from. However, Mitchell's report does not provide offers of comparable vehicles (reasonable pre-loss value of the total loss vehicle), but rather it provides Plaintiffs with fraudulently lower priced vehicles to choose from.

Mitchell uses a product called the Mitchell Work Center Total Loss (hereinafter "WCTL") which adjusts the price of the insured's vehicle based on what it determines to be the average condition of the car and compares that to the condition of the insured's car. WCTL does this by ignoring pertinent data when it would increase the comparable vehicle price, but by incorporating the same pertinent data when it would decrease the comparable vehicle price. A specific example is the WCTL misrepresents the status of prior salvage vehicles and holds these vehicles out to insured as comparable vehicles.

This fraudulent scheme ultimately deflates the value of declared "total loss vehicles" in order to pay first party insureds less than the actual pre-loss value of the total loss vehicle. Thus, by concealing the true value of the insured's total loss vehicle, making false and misleading statements, failing to remedy the deflation, and failing to properly compensate Plaintiffs and Class Members, Defendants violated and continue to violate the CLRA § 1770(a), in at least the following respects:

1.  Representing that…services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have, in violation of Cal. Civ. Code §1770(a)(5);

2.  Representing that … services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another, in violation of Cal. Civ. Code §1770(a)(7);

3.  Advertising … services with intent not to sell them as advertised, in violation of Cal. Civ. Code §1770(a)(9).

4.  Representing that a transaction confers or involves rights, remedies, or obligations that it does not have or involve …" Cal. Civ. Code §1770(a)(14).

Plaintiffs are first party insureds of the Progressive Defendants and therefore consumers under the CLRA. The Progressive Defendants knew or should have known that Plaintiffs were legally entitled to recover the benefits under the aforementioned insurance policy, and that Progressive was obligated to provide Plaintiffs with benefits under the insurance policy. However, the Progressive Defendants, through Mitchell, provided Plaintiffs with false and misleading valuation reports that misrepresented the comparable vehicles' value, submitted false dealer reports, and refused to consider comparable vehicles by the insureds, which in turn caused a tangible burden to each consumer/insured and increased the cost to each insured. The consumer/insured faced a choice of either settling



quickly for a low-ball offer or to go through a long drawn out fight, where the Progressive Defendants clearly had the upper hand.

The Progressive Defendants intentionally, maliciously, and oppressively conducted themselves willfully and wrongfully and made material misrepresentations about the condition of comparable vehicles to every one of its insured. Defendants unreasonably failed to pay Plaintiff Stack's claim for benefits under the total loss vehicle provisions of her policy. As a result of Defendants wrongful conduct, Plaintiff has been denied the reasonable value for her total loss vehicle and incurred reasonable rental car costs for the delay in resolution of the matter. Defendants' actions in wrongfully reducing the value of total loss vehicles constitute a pattern and practice of Progressive, which is designed to wrongfully withhold payment of claims with the intent of ignoring the interest of their insured.

## II. **DEMAND FOR RELIEF**

These unfair or deceptive acts or practices of Defendants violate the CLRA. We request that you offer Tasha Stack and the Class full restitution. Specifically, provide a consumer fund in an amount sufficient to fully reimburse every class member for actual reasonable value of their "total loss vehicles." Of course, this would be subject to our review, as class counsel, of appropriate financial information detailing all warranty sales to California consumers during the Class Period.

This letter also serves as a demand that you preserve and maintain all pertinent records, including but not limited to, all electronic records and data, pending resolution of this matter, in accordance with state and federal law, including but not limited to: all internal manuals, written policies, directives, memoranda, correspondence, emails and other records of communication concerning the data collection in connection with the WCTL reports; all advertisements disseminated discussing or concerning WCLT; any materials disseminated to consumers that discuss or concern the policy provision regarding coverage for total loss vehicles; any complaints from any source concerning payments for total loss vehicles under Progressive automobile insurance policies.

Finally, we also request that Defendant provide for all costs, reasonable attorney fees, and claims administration costs pursuant to California Civil Code sections 1750, *et seq.*

If Defendants fail to comply with this request within 30 days, they may become liable for the following damages under § 1780 of the CLRA:

- actual damages suffered;
- punitive damages;
- restitution;
- costs and attorney's fees related to suit; and



**Kabateck** LLP

- penalties of up to $5,000.00 for each incident where senior citizens have suffered substantial physical, emotional or economic damage resulting from Defendants' conduct.

We hereby demand on behalf of Plaintiff and the Class Members that Defendants immediately correct and rectify their violations by providing the remedies delineated above on a class wide basis. It is our hope that Defendants will choose to correct these unlawful practices promptly. A failure to act within 30 days will be considered a denial of this demand and Plaintiff will act accordingly.

If you would like to discuss the matter, please do not hesitate to contact us at:

Brian S. Kabateck
bsk@kbklawyers.com
Katherine Bruce
kb@kbklawyers.com
Stephanie E. Charlin
sc@kbklawyers.com
KABATECK LLP
633 W. Fifth Street, Suite 3200
Los Angeles, CA 90071
Telephone: 213-217-5000
Facsimile: 213-217-5010

Otherwise, we look forward to Defendants immediately changing their practices and compensating Plaintiff and Class Members as identified above.

Thank you for your attention to this matter. We look forward to your response.

Very truly yours,
Kabateck LLP

Stephanie E. Charlin

# EXHIBIT C

1

Brian S. Kabateck, Esq. (SBN 152054)

2

bsk@kbklawyers.com
Christopher B. Noyes, Esq. (SBN 270094)

3

cn@kbklawyers.com
Katherine A. Bruce, SBN 288694

4

kb@kbklawyers.com
Stephanie E. Charlin, SBN 316543

5

sc@kbklawyers.com
**KABATECK LLP**

6

633 W. Fifth Street, Suite 3200
Los Angeles, CA 90071

7

Telephone: (213) 217-5000
Facsimile: (213) 217-5010

8

Attorneys for Plaintiffs and the Putative Class

9

10

## UNITED STATES DISTRICT COURT

11

## NORTHERN DISTRICT OF CALIFORNIA

12

TASHA STACK, individually, on behalf

13

of herself and on behalf of all others
similarly situated;

14

Plaintiffs,

15

vs.

16

PROGRESSIVE SELECT INSURANCE

17

COMPANY, PROGRESSIVE
CASUALTY INSURANCE COMPANY

18

and DOES 1 through 50, inclusive;

19

Defendants.

Case No.

**AFFIDAVIT PURSUANT TO CIVIL CODE SECTION 1780(d)**

20

21

22

23

24

25

26

27

28

1

## <u>AFFIDAVIT PURSUANT TO CIVIL CODE SECTION 1780(d)</u>

I, Stephanie E. Charlin, acting as the attorney of record for the Plaintiff TASHA STACK individually, on behalf of herself and on behalf of all others similarly situated in the above commenced action, act now with agency and authority to execute this affidavit on his behalf.

This action is brought in the United States District Court – Northern District of California as a proper place for the trial of the action. Defendants PROGRESSIVE SELECT INSURANCE COMPANY and PROGRESSIVE CASUALTY INSURANCE COMPANY transact business in this district and a substantial part of the events giving rise to at least some of Plaintiff's claims occurred, in part, in the Northern District of California, while Plaintiff resides in this district.

I hereby declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 14th day of January 2019, in Los Angeles, California.

Stephanie E. Charlin

---

2